CASSIDY, *Appellant* v. METCALF *et al.*

**Power of a Court of Equity to reform Contracts.** A court of equity will order a contract to be reformed so as to make it speak the actual agreement of the parties, when satisfied, that by mistake, in reducing it to writing, property has been transferred which it was not the intention of either should be included in the contract—and this in a case where the complainant himself drew the paper. It is immaterial how the mistake happened, whether by a misunderstanding of the meaning of words, or through sheer carelessness. But where it appears that the complainant has been guilty of such breaches of the real contract as substantially to deprive the other party of all its benefits, the reformation will be ordered only on condition that the parties be put, as nearly as may be, in *statu quo ;* as by the return of all moneys received by the complainant under the contract.

*Appeal from St. Louis Court of Appeals.*

The case is reported in 1 Mo. App. 593.

*Hitchcock, Lubke & Player* and *Ellis & Sullivan* for appellant.

1. When by mistake, the written agreement contains less than the parties intended, or contains more; or where it simply varies from their intent, by expressing something different in substance from the truth of the intent—in all such cases, if the mistake is clearly made out by proofs entirely satisfactory, equity will reform the contract, so as to make it conformable to the precise intent of the parties. 1 Story Eq. Jur., § 152. It is the province of a court to enforce the contracts and conveyances of the parties, and

not to make or alter them; but it is the duty of the court to enforce the contract which was really made, and when by mistake that contract is not expressed in such terms as to have the force and effect that the parties intended it should have, then it is the clear duty of the court to correct the mistake in the instrument.    *    *    *    * It is not necessary, in order to establish a mistake in an instrument, that it shall be shown that particular words were agreed upon by the parties as words to be inserted in the instrument.    It is sufficient that the parties had agreed to accomplish a particular object by the instrument to be executed, and that the instrument as executed is insufficient to effectuate their intention.    The power of a court of equity to reform an instrument which by reason of a mistake fails to execute the intention of the parties is unquestionable.    *Leitensdorfer v. Delphy*, 15 Mo. 166.    Mistakes may consist either in the circumstance that the instrument by which the parties intended to express their intent does not so express it, or does not express it accurately, or in the circumstance that the intention of the parties, though correctly expressed, has nevertheless been reached through some misapprehension or ignorance.    In the one case the intention is erroneously expressed; in the other, the intention is founded in error.    The relief pertinent to the first case is correction; to the second, recission.    Bispham's Eq. Prin., § 190.    A court of equity has jurisdiction to reform a written contract upon parol evidence where the agreement made by both parties has not been correctly incorporated into the instrument through accident or mistake in framing it.    *Tesson v. Atlantic Mut. Ins. Co.*, 40 Mo. 36; *Hunt v. Rousmaniere*, 1 Peters 13; *Bradford v. Union Bank*, 13 Howard 68; *Botsford v. McLean*, 45 Barb. 478; *Lyman v. United Ins. Co.*, 17 Johns. 372; *Keisselbrack v. Livingston*, 4 Johns. Ch. 144; *Coles v. Bowne*, 10 Paige Ch. 534.

2.    As to the evidence required for a decree of reformation on the ground of mistake:    Relief will be granted

in cases of written instruments, only where there is a plain mistake clearly made out by satisfactory proofs. 1 Story Eq. Jur., § 138 *e* note *a* and cases cited.

3. The prevention of a fraudulent or unconscionable advantage, whether claimed on the ground of contract, or even of a statute, is always sufficient ground for equitable relief. 1 Story Eq. Jur., §§ 759, 138*e*; 2 Ib. § 1522*a*; *Farrar v. Patton*, 20 Mo. 84; *Dickerson v. Chrisman*, 28 Mo. 140; *Townsend v. Hawkins*, 45 Mo. 286; 2 Washburn Real Prop. (3rd Ed.) p. 487; *Strong v. Stewart*, 4 John. Ch. 167; 2 Story Eq. Jur., § 1522*a*; *Wilson v. Drumrite*, 21 Mo. 329.

4. Counsel made an argument upon the facts to show that there was no want of equity in the plaintiff, insisting that he had not bound himself not to go into the same business again in St. Louis, and that the dissolution of the firm into which defendants bought, was not the result of any act of his.

*Thomas A. Russell* for respondents.

In his petition, plaintiff, after setting forth the words of the contract, avers " that he, the said plaintiff, in good faith supposed that the said words, so used in said instrument, conveyed and expressed correctly the nature of the said agreement, which he had in fact made." This shows that the language used in the written agreement was deliberately used, and the plaintiff, who drew up the instrument, did not intend the use of other words, believing that those used correctly expressed. the intention of the parties to the agreement. The written agreement was exactly what both parties intended it to be, neither more nor less.

All the testimony goes to show that plaintiff used the words without any suggestion from defendant Moore, whatever. Supposing, for the sake of argument, that plaintiff did not correctly express his intention, was the mistake one of law or of fact, and is it to be treated as a mistake at all? A mistake of law arises when a person under an

erroneous conviction of law does or omits to do some act which, but for the erroneous conviction, he would not have done or omitted. We think that the mistake would be one of law.

The use of words that have been construed by the courts, and to which has been attached certain definite legal significance, should bind the parties. The word "interest" has had a certain definite meaning, a fixed legal significance for a century, and yet a person using it without understanding its legal effect, is said to have committed a mistake of fact. This will not hold good; it is a fact, according to his allegations, only that he did not understand the legal effect of the words he used, and was ignorant of the construction courts had given them, but the use of the word was no mistake of fact.

His mistake was one of law against which a court of equity will not relieve. *Smith v. Powell*, 14 Law Rep. 90; *Penny v. Martin*, 4 Johns. Ch. 567; *Durant v. Bacot*, 2 Beaseley 201; *Burt v. Powell*, 28 Cal. 632; *Hoover v. Reilly*, 2 Abb. (U. S.) 471; *Nelson v. Davis*, 40 Ind. 366; *Heavenridge v. Mondy*, 49 Ind. 434; *Wood v. Price*, 46 Ill. 439; *Goltra v. Sanasack*, 53 Ill. 456; *Gordere v. Downing*, 18 Ill. 492; *Brantley v. West*, 27 Ala. 542; *Sims v. Lyle*, 4 Wash. C. C. 320; *Wintermute v. Snyder*, 2 Green Ch. 490; *Broadwell v. Broadwell*, 1 Gilman, (6 Ill.) 600; *Hall v. Reed*, 2 Barb. Ch. 500; Adams Eq., Marg. pp. 189, 191; 1 Story Eq. Jur., §§ 120 and 151; *Lyon v. Richmond*, 2 Johns. Ch. 51; *Champlin v. Laytin*, 18 Wend. 407; Viner Abr. Tit. Ch. N. Com. Dig. 3 F. 8; *Hunt v. Rousmaniere*, 1 Pet. 1; *Shotwell v. Murray*, 1 Johns. Ch. 512; *Storrs v. Barker*, 6 Id. 166; *Arthur v. Arthur*, 10 Barb. 9; *Gilbert v. Gilbert*, 9 Barb. 532; Bispham Eq. Prin., § 187; Kerr on Fraud and Mistake 409, 414; *McElderry v. Shipley*, 2 Md. 25; *Leavitt v. Palmer*, 3 N. Y. 19; *Stoddard v. Hart*, 23 N. Y. 556; *Garner v. Bird*, 57 Barb. 277; *Thompson Scale Man. Co. v. Osgood*, 26 Conn. 16; *Morris v. Labarra* 58 Me. 26 *Harney v. Charles*, 45 Mo. 157.

2. Counsel examined and distinguished the following cases on the same general subject; *Wyche v. Green*, 11 Ga. 159; *Smith v. Jordan*, 13 Minn. 271; *McAninch v. Laughlin*, 13 Pa. 371; *Wemple v. Stewart*, 22 Barb. 154; *Glass v. Hurlburt*, 102 Mass. 24; *Stone v. Godfrey*, 18 Jur. 162; *Phibbs v. Cooper*, 2 L. R. H. L. 149; *McCurdy v. Brethill*, 5 Monroe 232; *Lawrence v. Beaubien*, 2 Bailey 623; *Garrard v. Frankel*, 30 Beav. 445.

3.—The parol evidence received on the part of the plaintiff was inadmissible. 1st. Because it related to conversations and negotiations had prior to the execution of the contract. *Wood v. Price*, 46 Ill. 439; *Rich v. Jackson*, 4 Brown Ch. 515; *Wheaton v. Wheaton*, 9 Conn. 96; *Winch v. Winchester*, 1 Ves. & B. 375; *Maybank v. Brook*, 1 Brown Ch. 84; *Lord Irnham v. Child*, 1 Brown Ch. 92; *Lord Portmore v. Morris*, 2 Id. 219; *Hare v. Sherwood*, 3 Id. 168; 1 Ves. Jr. 242; *Jordon v. Sawkins*, 3 Id. 388; 1 Ves. Jr. 402. 2nd. Because it was indirect, inferential, and founded upon suppositions and understandings not based upon any interchange of ideas. Lord Thurlow in *Shelburne v. Inchiquin*, 1 Bro. Ch. 338; *Sutherland v. Sutherland*, 69 Ill. 481; *Potter v. Potter*, (Sup. Ct. Iowa,) 3 Cent. Law Jour. 602. 3rd. Because it is, if not incompetent, so irrelevant, so weak, as to carry with it no weight whatever. Counsel accompanied this objection with an elaborate examination of the evidence in the case.

NAPTON, J.—This is a bill in equity to reform a written contract, which was alleged by mistake not to have corresponded with the previous parol agreement of the parties, and to enjoin proceedings on a suit at law on said written instrument.

The plaintiff's petition, after reciting the fact that he had been a partner in the firm of Irons, Cassidy & Co., in which his brother, J. C. Cassidy and Irons, and one Berry and himself were equally interested, stated that he sold out, or intended to sell out, his place in said firm to the

defendants for $5,000, but that the contract which was executed to carry out this sale used a term which did not effectuate the intention of either of the parties; that the intent and understanding of both parties was that he was conveying only his interest (one-fourth) in the good will and prospective business of said firm, and not his share of the assets of the firm, accumulated at the date of the contract. The plaintiff, therefore, asks that the word interest, which is used indefinitely and without qualification in the written contract, be followed by the words: "in the good will and prospective profits" of the firm of Irons, Cassidy & Co. He further states that defendants have brought a suit at law on said contract, and therefore in such action have an unfair and unconscientious advantage, and asks an injunction against such proceedings.

The defendants deny the mistake; aver that the instrument was drawn up by plaintiff himself, and truly expressed the previous understanding and agreement of all parties. Both the bill and answer are sworn to.

On the hearing in the circuit court, a perpetual injunction was granted, but on appeal to the St. Louis Court of Appeals, this decree was reversed and the bill dismissed.

The testimony is very voluminous. The material facts deducible from it may be stated as substantially these: The plaintiff, wishing to sell out his position in the firm of Irons, Cassidy & Co., a commission house, dealing in the purchase and sale of live stock, about the 1st of August, 1873, wrote to Metcalf, one of the defendants, inviting him to come down to St. Louis. Metcalf and Moore were living on two adjoining farms, in Chariton county, near Brunswick, and had been jointly engaged in buying, feeding and selling live stock, and had, for some years previously, entrusted their business in St. Louis to this commission house of Irons, Cassidy & Co., and were, consequently, well acquainted with the members of the firm. The reason alleged by plaintiff for desiring to sell out and quit the business was that his confinement to the office, as

financial manager, had injured his health, and he desired a more active life in the country. In accordance with this invitation of plaintiff, Moore, one of the defendants, came down to St. Louis, on the 5th of August, with some stock, and, after ascertaining from plaintiff the terms on which he proposed to sell, and learning something of the financial condition of the firm during the past year, and the amount of capital it would be necessary to advance, concluded to consult with Irons, Berry and A. C. Cassidy, to ascertain whether their accession to the firm, in place of W. L. Cassidy, would be agreeable to the other partners, and also whether these partners would be willing to advance them the necessary capital. They all assented, with apparent cordiality, and promptly offered, as plaintiff had previously suggested they would do, to advance to Moore and Metcalf their share of capital, charging them ten per cent. on such advance. The plaintiff had previously offered to show Moore the books, and did lead him into the office, inviting his inspection of them, but upon Moore saying that he was no bookkeeper and would probably derive very little information from them, he assured Moore, in general terms, that the profits of the concern during the previous year had been between thirty and forty thousand dollars. In the evening, before Moore's departure for Brunswick, after a very short, hasty and indefinite conversation, plaintiff sat down and wrote the following contract, which was immediately signed by Moore for him and Metcalf:

St. Louis, August 7th, 1873.

Articles of agreement entered into this day by and between W. L. Cassidy, of the firm of Irons, Cassidy & Co., St. Louis, Missouri, party of the first part, and W. F. Moore and James Metcalf, of Brunswick, Chariton county, Missouri, party of the second part. The said party of the first part agrees to sell to the party of the second part his interest (one-fourth) in the firm of Irons, Cassidy & Co., a

live stock firm doing business in the city of St. Louis, State of Missouri, the party of the second part agreeing to pay the party of the first part three thousand dollars in cash, and the remainder in a negotiable note, or young stock that they have on their farm near Brunswick, Missouri. Possession to be given on first day of September, 1873, the party of the first part to receive for the said one-fourth interest five thousand dollars—to be paid as is above described. Given under our hands this day.

   (Signed)               W. L. CASSIDY,
                          METCALF & MOORE.
   (Witness : G. W. DOERR.)

The plaintiff, in his examination in chief by his counsel, declares that he was thinking of and using the word "influence," and intended to use that word in drawing up this instrument, but the word "interest" popped into his head just as he came to that part of the writing, and he put it down interest instead of influence; that he never heard of the term "good will," as used in this connection, at the date of this writing, and, of course, had no intention of using it. Neither Moore nor plaintiff used the term "good will," nor understood its meaning, as a technical phrase.

Moore and Metcalf moved down to St. Louis, and on the first of September, 1873, took the plaintiff's place in the firm. The books and papers of the old firm were removed by plaintiff and his bookkeeper, Doerr, to an office near by, and new books were opened by the new firm, and a new bookkeeper appointed. The plaintiff very soon started up the country, partly with a view to collect outstanding accounts of the old firm, and, when expedient, to take cattle in liquidation, and partly to purchase on speculation for himself. In this view, he from time to time, drew out the most of his share of the assets of the old firm, amounting to between eight and ten thousand dollars. On these visits he is reported to have taken occasion

to suggest some unfavorable comments on the capacity of Moore and Metcalf to supply his place in the old firm, to intimate that his trade with them was not so good a one for them as they imagined, and that the business of the new firm would fall off, as the heavy profits of the preceding year had been made by *bulling* the trade. This is denied by plaintiff. However this may be, and we may notice it hereafter, on the plaintiff's final return to St. Louis, he established another commission house in the live stock business, within a few doors of the old concern, on the 1st December, 1873. This produced great dissatisfaction on the part of the defendants, which, after various and repeated disputes, finally terminated in the suit on the contract, which it is the object of the present proceeding to enjoin.

Meanwhile, the plaintiff and his former associates proceeded to settle up the old concern, and on the 25th December, made a final division. In January, 1874, A. C. Cassidy, brother of plaintiff, complained of neuralgia, and gave notice of his intention to retire from the firm, upon which announcement Irons and Berry declared their determination to do the same. The defendants remonstrated against this, but as Cassidy was resolved, and his associates were likewise determined on following his example, there was no alternative, but to consent to a dissolution, which was formally effected on the 9th of February, 1874. At this settlement the defendants jointly were found entitled to $3,597.16, or $1,799.58 each.

The first question which is presented, assuming the mistake as alleged in the petition, or as proved by the evidence to have been made, is, whether the mistake is such an one as falls within the province of a court of equity to correct. It is insisted by the defendants' counsel that the mistake, either as stated in the petition or as proved, is one of law, from which a court of equity cannot relieve. It is conceded that mistakes of law, unless accompanied with fraud, misrepresentation, concealment, surprise, or

some similar peculiarity of circumstance, furnish no ground of equity jurisdiction. The elementary maxim *ignorantia legis neminem excusat*, prevails in the administration of civil as well as criminal law, and is as potent in a court of chancery as in a common law court. There is, no doubt, a considerable difficulty in reconciling the adjudged cases on this subject, and perhaps still more in deducing from them the principle upon which the discrimination between mistakes of law and fact has rested. We shall not undertake to review them, since that task has already been accomplished by Judge Story, in the 5th chapter of his work on Equity Jurisprudence. We will simply refer to two or three cases, which seem to us, clearly to point out the distinction, so far as it is applicable to the facts of this case.

The case of *Hunt v. Rousmaniere*, (1 Peters 13,) appears to illustrate the precise points presented by the pleadings and evidence in this case. There, the plaintiff, who was asking relief, had lent a considerable sum of money to Rousmaniere, who was the owner of two brigs, and offered to give the plaintiff, in order to secure the loan, in addition to his notes, a mortgage on either or both vessels. They accordingly went together to a lawyer to have an effectual security drawn up, but upon ascertaining that a power of attorney from Rousmaniere would accomplish the same purpose as a mortgage, in the opinion of the lawyer, and to avoid the necessity of changing the vessels' papers, which a mortgage would require, the plaintiff preferred the power of attorney, which was accordingly drawn up, by consent of all parties. The death of Rousmaniere shortly afterwards, made the security selected insufficient, but the Supreme Court decided that they could furnish no relief in such a case, because the instrument selected was the very one which both parties agreed on and intended, and the only mistake was as to the legal operation of the one selected. Mr. Justice Washington takes occasion to state, however, in his opinion refusing any aid to the plaintiff, that "when an instrument is drawn and exe-

cuted, which professes or is intended to carry into execution an agreement, whether in writing or by parol, previously entered into, but which by mistake of the draftsman, either as to fact or law, does not fulfill, or which violates the manifest intention of the parties to the agreement, equity will correct the mistake, so as to produce a conformity of the instrument to the agreement. The reason is obvious. The execution of agreements, fairly and legally entered into, is one of the peculiar branches of equity jurisdiction, and if the instrument which is intended to execute the agreement be, from any cause, insufficient for that purpose, the agreement remains as much unexecuted as if one of the parties had refused altogether to comply with his engagements, and a court of equity will, in the exercise of its acknowledged jurisdiction, afford relief in the one case as well as in the other, by compelling the delinquent party fully to perform his agreement, according to the terms of it and to the manifest intention of the parties. So, if the mistake exists, not in the instrument, which is intended to give effect to the agreement, but in the agreement itself, and is clearly proved to have been the result of ignorance of some material fact, a court of equity will, in general, grant relief, according to the nature of the particular case in which it is sought." This case was the third time before the court when this opinion was delivered, and of course, was the result of mature deliberation, and its language carefully considered and it has, therefore, been regarded as a leading case, and adopted by Judge Story in his treatise on this subject, and followed by Chancellor Kent in 4 Johns. Ch. 567, and by this court in *Leitensdorfer v. Delphy*, 15 Mo. 160. It is a mistake to suppose it based on the disputed or overruled case of *Lansdowne v. Lansdowne*, (Mosely 364,) since Judge Washington takes occasion, distinctly, to repudiate some of the observations of Lord King, in that case.

The case of *Wintermute, Exr. v. Snyder's Exr.*, (2 Green. Ch. R.,) affords another illustration of the position of the

Supreme Court of the United States in *Hunt v. Rousmaniere.* Here, there was a bequest of a certain portion of the testator's estate, on the death of his wife, to the heirs of one of his brothers, who was dead, and to Peter Snyder (another brother) and his heirs, and William Snyder and his heirs—the two brothers, Peter and William, being both then living—to be divided equally between them, share and share alike. After the death of the testator, and before the death of his wife, who had a life estate under the will in the whole property, William Snyder assigned all his interest over to Wintermute. This assignment was for a small consideration, and was executed under the mistaken impression that his interest never vested until the death of the widow, and that his children were equally entitled with himself; but, in truth, the fee simple title to the whole interest vested in William Snyder, on the death of the testator, and there was no contingency depending on the death of the widow. The Chancellor refused relief, because the instrument conveyed precisely what the parties intended, and they were merely mistaken as to what that interest was at law. At the same time the Chancellor observed, that if there had been any mistake in the agreement itself, so that it did not contain what the parties had agreed on, a very different case would have been presented, and he cites Judge Washington's opinion, above referred to, in support of this position.

The case of *Powell v. Smith,* (Eq. Cases, Vol. 14, p. 85) a recent decision of the Master of Rolls, is relied on as establishing that the insertion of the word "interest," in the contract drawn up by plaintiff, was a mistake of law, and that seems the most pointed one in this direction, it is proper to give it a particular examination. It was a contract between a landlord (or which is the same thing, his agent,) and a tenant. The memorandum, in writing, was as follows: " Terms agreed upon, this, the first of October, 1870. Lease to be for 7, 14 or — years, from the 29th of September, 1870." The construction of such an agree-

ment was well settled in England; it meant that the re-
newal of the lease, at the end of 7 years, was at the option
of the tenant. The application to the court was made by
the tenant for a lease of this character, but the landlord
resisted it, on the ground that he, or his agent, understood
that such agreements meant that the renewal at the end
of 7 years was at the option of the landlord. There was
no dispute but that the memorandum contained exactly
what was intended—at all events, by the tenant—and a
specific performance was decreed. Lord Romily says:
"The words of the agreement are not disputed on either
side. All those cases which have been cited during the
argument, are cases where there was either a dispute and
doubt as to the thing sold, or where the words of the
agreement expressed certain things in an ambiguous manner,
which might be misunderstood by one of the parties. In
all those cases the court has held that it would look at the
evidence, and that if the mistake is sufficiently proved,
the court will then set aside the agreement. But here the
words of the agreement are quite certain, and the only
thing that was not understood was the legal effect of cer-
tain words which it contained. Now, that is no ground of
mistake at all. It is a question upon the construction of
an agreement, agreed to by everybody concerned."

We are unable to perceive any material conflict be-
tween this opinion of the Master of the Rolls and the
American cases we have cited. Assuming the facts to be
as stated, the case now under consideration falls within the
reasoning of all three of the cases cited. The written agree-
ment did not express what either party intended. The
word used to express the thing sold, without qualification,
did not convey the meaning of either party. The seller
did not intend to part with the profits already his, nor did
the buyer expect to acquire them. They were not the
subject of their negotiation. The paper drawn up by the
scrivener, who, in this case was the plaintiff himself, did
not correspond with the verbal agreement previously

made. It is immaterial how or why, this was so, whether by a misunderstanding of the meaning of words or by sheer carelessness. The real agreement between the parties has never been reduced to writing.

It is unnecessary to go into any critical analysis of the evidence, for the purpose of determining that the parties did not make such an agreement, as the one written imports. That question can hardly admit of a doubt. To say nothing of the positive statements of the plaintiff on his examination at the trial, and the failure of the defendants, when interrogated, to make any definite statements on the point, the acts of both parties are conclusive. The application of defendants to Irons, A. C. Cassidy and Berry for an advance or loan of defendants' proportion of capital needed, at 10 per cent., is scarcely to be reconciled with the hypothesis that they had bought or supposed they had bought the defendant's interest in the assets of the old firm. Their failure to take any interest in the books, accounts and final settlement, tends to the same conclusion. That the plaintiff did not so understand the contract is plain, since, to say nothing of his whole course after the sale, it was not at all credible that, with his knowledge of the financial condition of the firm, he would have sold for $5,000 what he knew to be worth $8,000 to $10,000. We have no doubt, therefore, that a mistake was made in the written contract, and one which a court of equity may reform—but whether a court will grant this aid, or, if so, upon what terms, is another question, which presents very different considerations.

It will be observed that in the extracts herein made from the carefully expressed opinion of Judge Washington, the court places the power of the courts of equity to reform contracts on the same basis as the power to enforce specific performance. It is because the verbal contract is virtually unexecuted that a reformation is asked, and when asked, the reformation of it must put it in a shape in which both parties may be compelled to perform. In the case

now under consideration, performance of the real contract is claimed by the party asking relief, and the plaintiff, being quite conscious that, in order to get relief from a court of equity, he must have already done what was equitable and just on his side, or must, at least, be ready to do so, claims that he has given everything to defendants that he sold them. What was it, then, that he sold? According to his own reiterated assertions, he sold "his place and influence" in the old firm; that the establishment of a second house, in the same line of business, within a few doors of the old house, was a palpable breach of this contract, is clear. Such an establishment was inconsistent with the exercise of the influence promised in favor of the old concern. The conversations of plaintiff, during one of his first visits up the country, after the first of September, had a strong tendency to show that he then anticipated a short career for the new firm into which he had inducted the defendants, and was already contemplating a resumption of business himself. This conversation, it is true, is denied by him—but subsequent events seem to confirm the material accuracy of the testimony on that subject, and the testimony itself bears the marks of truth and candor, and could not easily have been invented and stated in a shape to evade the rigid cross-examination to which it was subjected; and the subsequent statements of the plaintiff, in November, to one of the defendants, who had heard a rumor of the probability of plaintiff's re-establishment in the same stock yard, tends further to show the state of the plaintiff's views on this subject. He insisted that he had a right to set up in business again—that the defendants had imposed no restrictions on him in their contract; that at that time he had no intention to commence again in St. Louis, but had thought of Chicago, Buffalo, &c., and this was soon followed by his re-establishment in the same business, immediately upon his final return to St. Louis, about the first of December. So far, then, as any influence is concerned, the defendants did not get what he says he sold to them.

But, it is said, they at least got his place in the firm, and that his premature dissolution was a matter over which he had no control, and with which he had nothing to do. It is true, that there is no proof of any direct agency of his in procuring the dissolution—but the whole history of the transaction leads us to the conclusion that he was the primary and sole cause of it. His establishment of a competing house, within a few feet of the other, manifestly incompatible with his promised influence in favor of the old firm, after defendants were admitted as partners, in his place, at once opened the eyes of the defendants to the insecurity of their position and the worthlessness of their title. The dissatisfaction and alienation of feeling, consequent on this, led to repeated and unfriendly interviews with the plaintiff, and finally culminated in a suit at law. Mr. A. C. Cassidy, the brother and former partner of the plaintiff, seeing the state of feeling thus engendered between his brother and his then partners, very naturally concluded to retire from the firm, and thus avoid the unpleasant predicament of being forced to take sides, either with his brother and against his partners, or with his partners and against his brother. The other partners, Irons and Berry, old associates of the plaintiff, very naturally followed his example. In short, the entire testimony in this case shows that Irons, A. C. Cassidy, Berry and the bookkeepers, all of whom were witnesses for the plaintiff, sympathized with him in the controversy. We are far from intimating, however, that this natural feeling had the slightest effect in causing them to deviate from the truth. On the contrary, we have adopted, substantially, their view of the real contract made between these parties. We merely mention the fact, along with other circumstances heretofore stated, to confirm the conclusion that W. L. Cassidy was the leading member of the old firm, and that his controversy with the defendants naturally, and almost inevitably led to the results which ultimately deprived the defendants of all the benefits they expected

and were entitled to derive from their trade with the plaintiff.

The dividend received by the defendants, on the dissolution of the new firm in February, we may presume was fairly earned by their services during the five months the association lasted, despite of the withdrawal of plaintiff's influence, and was probably an inadequate compensation for their losses in breaking up their business in Chariton county, and their expenses in removing to St. Louis, renting houses, &c. At all events, the plaintiff's influence contributed nothing, either to the increase of the profits or the stability of the concern, liable as it was under all circumstances, to interruption from the accidents of death or other casualties, and the mere position obtained by the contract, apart from plaintiff's influence, both in favor of its stability and its probability of yielding proportionate profits to those of former years, was worthless. We conclude that the plaintiff's conduct was not characterized by that good faith with which a party should always approach a court of equity, when asking its assistance. We do not concur, however, with the Court of Appeals in the ultimate result to which these views lead. As the contract sued on, at law, is not the contract which the parties made, the suit on it should be enjoined—but only on condition that the parties be put, as nearly as may be, *in statu quo.* This can only be done by a return of the purchase money, or rather so much of it as has been paid, we believe $3,600. On this condition, a perpetual injunction should be granted, and we therefore reverse the judgment of the Court of Appeals, and remand the case to the circuit court, with directions to make the conditional decree above indicated. The other judges concur.

REVERSED.