SUMMERS v. COLEMAN *et al., Plaintiffs in Error.*

Equity: CONVEYANCE, WHEN SET ASIDE: MISTAKE: FRAUD. Where the grantee in a deed represented she was seeking only a life estate in certain land, and presented to the grantor, her daughter, a deed to be executed therefor, and the latter made the deed under the belief that she was conveying a life estate, when in fact it conveyed an absolute estate in fee simple; *Held,* that whether the transaction was one of mutual mistake or of fraudulent misrepresention on the part of the grantee, equity will set aside the conveyance.

*Appeal from Cooper Circuit Court.*—HON. E. L. EDWARDS, Judge.

AFFIRMED.

*Smith & Krauthoff* and *Louis Wagner* with *L. F. Wood* and *Thomas B. Wright* for appellants.

There are mainly two points presented in this case for adjudication in this court. 1st, Can a conveyance of a bare possibility or an expectancy be upheld and enforced in equity. 2nd, If such a contract can be upheld and enforced in equity, are there any circumstances of fraud surrounding this transaction of a character to vitiate the contract. In equity contracts relating to expectancies, have long been upheld. Fonblanque's Eq., 170, 171, note E; Fry on Specific Perform., 496, 500; *Cook v. Field,* 15 Q. B. 460; *Wiseman v. Roper,* 1 Rep. in Ch. 154; *Beckley v. Newland,* 2 P. Wms. 182; *Lewis v. Madison,* 1 Munf. 303; *Stover v. Eycleshimer,* 3 Keyes 620; *s. c.,* 46 Barb. 84; *Field v. Mayor,* 2 Seld. 179; *Carleton v. Leighton,* 3 Meriv. 671; *Dodd v. Williams,* 3 Mo. App. 278, 286. The consideration expressed in the deed, the love and affection respondent bore to her mother, is sufficient to uphold the deed. *Wright v. Wright,* 1 Ves. Sen. 411, 412; *Bogy v. Shoab,* 13 Mo. 365; R. S. 1879, § 3940. There are no circumstances of fraud connected with the execution of the deed of a character to vitiate it. Fraud will never be presumed, but must be

clearly established by the proof. Story on Contracts, § 625 ; Story Eq. Jur., § 490 ; 3 Greenleaf Ev., § 254. The law will not assist one capable of taking care of his own interest, except in cases where he has been imposed upon by deceit, against which ordinary prudence could not protect him. Story Eq. Jurisp., § 237 ; *Blatchford v. Christian*, 1 Knapp R. 77 ; *Forrester v. Scoville*, 51 Mo. 268 ; *Johnson v. Quarles*, 46 Mo. 423. The plaintiff read the deed and knew the meaning of the words she was reading, or must be presumed to have understood them, which is the same in law. Brooms Legal Maxims, 252, 262, note 5, 276. The plaintiff's mistake, if made, was one of law, and she cannot claim relief. Pomeroy's Eq., § 843 ; *Toops v. Snyder*, 70 Ind. 554 ; *Zane v. Cawley*, 21 N. Y. Eq. 130 ; *Paine v. Jones*, 75 N. Y. 593 ; *Nelson v. Davis*, 40 Ind. 366 ; *Dunning v. Carpenter*, 48 N. Y. 408 ; 18 Cent. Law Jour. 8, note 2 ; *Ib.*, 9, note 6 ; 17 *Ib.*, 422. If the language of a deed is that intended to be used by the grantor, his mistake as to the legal effect of the language will afford no ground for relief in equity. *Burt v. Wilson*, 28 Cal. 632 ; *McMurray v. St. Louis, etc.*, 33 Mo. 377 · *Hendrix v. Wright*, 50 Mo. 310.

*Cosgrove & Johnston* with *Rice & Walker* for defendants in error.

The evidence shows that the deed from plaintiff to her mother was procured through fraud, and will be set aside. All contracts and conveyances, whereby benefit are secured by children to their parents, are objects of jealousy, and if not entered into with scrupulous good faith and reasonable under the circumstances, they will be set aside. *Baker v. Bradley*, 35 Eng. L. and Eq. Rep. 449 ; 1 Story's Eq. Jurisp., p. 292. There is a presumption of fraud in law from the confidential relation of the parties. *Garvin v. Williams*, 50 Mo. 206 ; *Street v. Goss*, 62 Mo. 226 ; *Cocking v. Pratt*, 1 Ves. 400 ; *Slocum v. Marshall*, 2 Wash. C. C. R. 397. It devolves on defendants to show the utmost good faith, and that the

contract was a reasonable and provident one. *Davis v. Duke, etc.*, 2 Swan. 436 ; *Edwards v. Burt*, 2 DeGex, Mac. & G. 55 ; *Garvin v. Williams*, 50 Mo. 206. The conveyance, by reason of its subject matter, was fraudulent in law. *Boynton v. Hubbard*, 7 Mass, 112 ; *Chesterfield v. Jaussen*, 1 Atkyns, top page 301. Fraudulent representations as to the legal effect and operation of a contract, are sufficient to avoid the same. 2 White & Tudor's Eq. Cases, pt. 1, 559, 567, and cases cited ; *Berry v. Whitney*, 40 Mich. 65 ; Mitford's Eq., 149. Where the minds of the parties do not meet, and the conveyance does not xepress their intention, it should be set aside. Story's Eq. Jurisp., (9 Ed.) § 164 ; *Lertensdorfer v. Delphy*, 15 Mo. 160 ; *Johnson v. Huston*, 17 Mo. 58 ; *Hook v. Craighead*, 32 Mo. 405 ; *Young v. Coleman*, 43 Mo. 179 ; *Cassiday v. Metcalf*, 66 Mo. 519. Plaintiff's deed attempting to convey a mere possibility or hope of inheritance in the lifetime of her ancestor, is a nullity. *Alvis v. Schlesing*, 16 Reporter 780 ; *Beard v. Griggs*, 1 J. J. Marsh. (Ky.) 22 ; *Nicoll v. Railroad Co.*, 12 N. Y. 121 ; *Lamb v. Kamm*, 1 Sawyer (U. S. C. C.) 238 ; *Bayler v. Com.*, 40 Pa. St. 37 ; *Dart v. Dart*, 2 Conn. 250 ; *Jones v. Roe*, 3 D. & E. 42 ; *Boynton v. Hubbard*, 7 Mass. 112 ; *Kercheval v. Triplett*, 1 J. J. Marsh. (Ky.) 22 ; 1 P. Wms., 312, 313 ; 3 *Ib.*, 293 ; 1 Wils. 323 ; 2 Vesey 144. The conversations had with Virginia Summers, and her declarations as to the purpose and effect of the deed prior to, at the time of and subsequent to its execution, were competent; were a part of the *res gestae*. *Thomas v. Wheeler*, 47 Mo. 363 ; *Darrett v. Donnelly*, 38 Mo. 492 ; *Potter v. McDowell*, 31 Mo. 62 ; *Gamble v. Johnson*, 9 Mo. 605.

EWING, C.—On the 13th day of December, 1877, the plaintiff filed in the Cooper county circuit court a petition stating her cause of action as follows :

That Lewis A. Summers died at Cooper county on the 4th day of May, 1877, intestate, seized of certain real estate situate in said county, and also of personal property valued

at $10,000, leaving the plaintiff as his only heir at law and legal representative. Plaintiff was the daughter and only child of John Fenton Summers and Virginia Summers, and John Fenton Summers was the only son and child of Lewis A. Summers. John Fenton Summers died intestate, in the year 1857, leaving plaintiff and his widow Virginia Summers his only representatives and heirs at law. Virginia Summers died testate at Cooper county, December 1st, 1876.

In the year 1873, and prior and subsequent to that time, the plaintiff resided at Ottumwa, Iowa, and for some time before and a long time after that time, plaintiff's mother, Virginia Summers, resided there also with her daughter, the plaintiff. During that time, and while Lewis A. Summers was yet living, the said Virginia Summers being possessed of little or no estate, requested the plaintiff to convey to her an undivided half interest in the estate of her grandfather, said Lewis A. Summers, to which she would be entitled upon his death, for the period of the natural life of the said Virginia Summers only, and for her maintenance and support, and plaintiff consented to make such conveyance to her mother as a free and voluntary gift for the period of her natural life only. Afterward, about the 22nd day of November, 1873, said Virginia Summers went to the plaintiff at Ottumwa and took with her a deed already drawn up for plaintiff to sign, and represented to plaintiff that it was a deed from plaintiff to her of an undivided half interest in all the estate which plaintiff expected to inherit as the only heir of the said Lewis A. Summers, for the use and support of the said Virginia Summers during her natural life.

Plaintiff was reared by her mother, and had always lived with her until a short time prior to the date last mentioned, and entertained great love, respect and affection for her, and imposed in her implicit confidence, and so believing what her mother told her as to the nature and effect of the deed, viz.: That it was a deed to an undivided half interest in the estate of expectancy which was to descend

to her from her grandfather Lewis A. Summers at his death, for the natural life of her mother for her support, plaintiff executed and delivered the deed to her mother, on the 22nd day of November, 1873.

The deed purported to convey, in consideration of $1, and love and affection, "the undivided half of all her interest in expectancy of whatsoever nature of, in and to all the real estate, personal property, moneys and effects which may hereafter descend to her by right of inheritance from Lewis A. Summers of Cooper county, Missouri, at the time of his death, whenever that may happen," etc.

Plaintiff then alleged that this deed was obtained by the fraudulent acts and representations of her mother, Virginia Summers, with the necessary averments, and asked the deed to be held void, etc.

Upon proper pleading, on part of the defendants, to show that they claimed the property by virtue of the will of their Aunt Virginia Summers, the case was tried. The evidence is voluminous, much of it irrelevant; not a little incompetent, and which should have been excluded; much of it upon the question of the insanity of Lewis A. Summers, the grandfather of plaintiff. For the purposes of this decision, however, it will not be necessary to refer to any of the testimony upon the question of insanity. The substance of the evidence upon the question of the fraudulent representations on the part of plaintiff and defendant, is as follows:

The testimony, offered by the plaintiff, shows that plaintiff (the only child of John Fenton and Virginia Summers), was the only heir of Lewis A. Summers, who died in Cooper county, Missouri, intestate, May 4th, 1877, seized of real estate worth from $10,000 to $12,000, and some personal property. Virginia Summers died December 1st, 1876; the deed to her from plaintiff was recorded December 6th, 1876.

Mary Augusta Scott, testified: I am Mother Superior of the Convent of Visitation at Ottumwa, Iowa; I remem-

ber the execution of a deed from Mary E. Summers to Virginia Summers, in the parlor of the convent at Ottumwa, Iowa, sometime in the fall of 1873; I was present at the execution of the deed; Mrs. Virginia Summers brought the deed to the convent; the deed was executed a short time after she came; she brought it with her already drawn up; I had conversation with Virginia Summers on the morning of the day on which the deed was executed, and prior to its execution; Mrs. Summers said she had asked sister, Mary Rose (plaintiff) to give her one-half of her (plaintiff's) grandfather's estate, during her (Virginia Summers') life, and at the end of that time it would return to her (plaintiff); the same conversation was repeated several times that morning before the deed was executed; the propriety of the execution of this deed was discussed among the sisters at the convent.

In her cross-examination she testified as to the vows of obedience, poverty and chastity taken by each member and their effect and obligations. The plaintiff had taken these vows before she executed the deed; when Mrs. Virginia Summers came to us to reside, in 1875, she offered me the deed to destroy; she said she wished to reside with us; that all she wanted with the deed was to have a home in her old age; she desired the deed for the purpose of securing herself a home in her old age; but, if we would give her a home during her lifetime, and allow her to remain with her daughter, she would give me up her deed to be destroyed, as it would be of no use to her, as she could not transfer a life estate. A council was called, and the proposition to receive her, was accepted. After that was decided she came to me and offered me the deed, and told me to destroy it, and I told her to keep it till she returned; she started then to Missouri to collect some money from her brother, and get everything settled up and then return; but never returned.

Dr. J. W. H. Ross testified as to the insanity of Lewis

A. Summers, from spring of 1873, to time of his death, in 1877.

Mina Fegers says: I reside at Ottumwa, Iowa, and am a member of the Convent of the Visitation there, I have been a member fourteen or fifteen years; I resided in the convent in 1873; I was then Mother Superior; I know of the execution of a deed from the plaintiff to Virginia Summers at Ottumwa, in 1873; Virginia Summers was present at the time the deed was executed; I talked to Mrs. Summers with regard to this deed, before it was signed; Mrs. Summers said, in regard to the deed, that it was a deed to a half interest in the estate of Lewis A. Summers, for her life; this conversation was before the deed was signed; she said at her death it would come back to her daughter, plaintiff; she talked to me several times about the deed before it was executed; in these other conversations she stated, this property she got from her daughter, would be for her lifetime; I do not remember whether plaintiff was present at any of these conversations or not; I never heard any conversations between plaintiff and her mother about it. Before the execution of the deed, I saw a letter from Mrs. Summers to her daughter; it was not very long before, I think about a month, may be not that long; I read this letter; the rule of the convent is, that all letters, sent or received, are read by the Mother Superior; this letter was destroyed; I was acquainted with the handwriting of Mrs. Summers; this letter was in her handwriting and was signed by her; in that letter Mrs. Summers asked her daughter, plaintiff, for half of the estate of her grandfather to use, only, during her life; then, at her death, it would come back to her daughter, Mary E. Summers. Plaintiff answered that letter; I read her answer; she said she was willing to give the deed on the conditions asked; I next saw Mrs. Summers, in a very short time after this, at the convent; she remained only a very few days, three or four; this was in 1873, in the fall; she came to bring a deed; she brought one already written. It was the same

deed signed by plaintiff. I advised plaintiff, as an act of charity, to give or transfer to her mother one-half of the estate which would descend to her from her grandfather, for her life, without consulting any other member of the society; I thought that since it was the mother of one of our sisters, she might, as an act of charity, make the transfer; I did not read the deed; I advised plaintiff to sign the deed without knowing what the contents were.

Charlotte S. Grace says: I reside at Ottumwa, Iowa, and am a member of the Convent of Visitation in that city; I know of the execution of a deed by plaintiff, to her mother, Virginia Summers; I think the deed was made in the fall of 1873; I had several conversations with Mrs. Summers about the execution of the deed before it was made. Mrs. Summers said, in substance, at this first conversation, that she had asked her daughter, the plaintiff, to give her half of her property for her lifetime, and at her death it was to be returned to her daughter, Mary E. Summers; she told me this once or twice before the execution of the deed, and afterward, oh! I could not tell the number of times; by half of her property, I mean half of her grandfather's estate, just for her lifetime, and then it was to come back again; and she then offered mother the deed; I had conversations after the deed was made, at which the same thing was repeated; I had a great many talks, oftener than ten times, I think; once I heard a conversation between Mrs. Summers and the sisters, at which she was rehearsing to the sisters what occurred between plaintiff and her mother, at the time the deed was made; she was laughing at what her daughter said about not understanding the deed; the plaintiff said she had read the deed, and it said, "to her heirs and assigns," what does that mean? why don't it say return to Mary E. Summers; she said "pshaw! are you not my only heir? you are my only heir, and it is not necessary to put Mary E. Summers;" we all laughed because Mary could not understand the deed; this conversation was before the signature of the deed; her mother

insisted upon her reading the deed, and Mary said, " what is the use ? " " what do I know about the law ; " and Mary then read down to the words, " heirs and assigns," and stopped—found out it was all the same—and asked her mother what it meant, and then the above conversation occurred ; I do not think she finished reading the deed, but cannot say certainly; there were several sisters around at this conversation, but I do not know who ; I was not present when the actual occurrence took place ; only at the rehearsal of it ; she wanted to come back and make her home with her daughter; when she left the last time, she had made application to stay in the convent, as a home ; the proposition to receive Mrs. Summers and give her a home at the convent, was decided affirmatively ; it was at this time when she was about to leave, and the carriage was at the door, that she offered mother the deed ; mother said, when she offered the deed, that it was not necessary to leave it ; she could bring it back with her.

Judge H. B. Hendershott, in his deposition, testifies, that he did not read or explain the deed to the plaintiff, nor did any one in his presence ; he took her acknowledgment, but did not write the deed.

Rev. John Krekel, in his deposition, says : I knew of the execution of the deed, by plaintiff, to her mother, November 22nd, 1873 ; I had, prior to this date, conversations frequently with the grantee in said deed ; in these conversations she always represented that her intention and purpose was to procure from plaintiff a life estate in the one-half of the estate of Mr. Summers, plaintiff's grandfather; from frequent conversations had between the plaintiff and her mother, with me, and in my presence, prior to and at the time of the execution of said deed, I am positive that Mrs. Summers, the grantee, only asked a life estate in said property, and that the plaintiff only intended to convey a life estate, and that Mrs. Summers represented that the property would revert to plaintiff at her mother's death ;

there was no valuable or money consideration whatever, for the execution of said deed.

Mary C. Chase testified she and Mrs. Summers had frequent conversations in reference to the deed. In all these conversations, Mrs. Summers stated that the only purpose of said deed was to give her a life estate in the property conveyed, and that at her death the property would revert to said plaintiff.

Eliza S. Coleman, in her deposition for defendant, says: In 1873, in the month of January or February, I saw a letter written by Mary E. Summers to her mother, Virginia Summers, from Ottumwa, Iowa, in relation to the insanity and estate of her grandfather, Lewis A. Summers, in which she requested her to go down to her grandfather's, have a guardian appointed for him, and see that the remainder of his estate was not wasted by the negroes, and she would then give her mother one-half of her grandfather's estate. Mrs. Summers handed me this letter to read, and I read it in my house in Otterville, and the foregoing is the substance of that letter. I do not now know where that letter is, but believe it was burnt by Virginia Summers in March, 1875, at which time she burnt up her letters. Virginia Summers afterward went to Boonville, and had a guardian appointed for Lewis A. Summers. In the latter part of April, 1873, I saw another letter from Mary E. Summers to her mother, Virginia Summers, in which she said: "I have had a talk with mother and the sisters, and they are willing that I should give you one-half of grandfather's estate, and you bring the deed when you come and I will sign it." This letter was in the handwriting of Mary E. Summers, and signed by her. This letter was, I suppose, destroyed at the same time she burned her letters.

Richard Coleman, for defendants, testified: I reside west of Otterville in Cooper county. Plaintiff is a neice of mine. Virginia Summers was my sister. Defendants are my neices and nephews. I am executor of Virginia Summers' estate named in the will. I visited Ottumwa,

32—80

Iowa, between the 19th and 24th of January last. My neice had been writing to me she wished me to come up and see her. I wrote that I did not feel able, and she wrote me she would give me $20 to defray my expenses if I would come up. I had not heard of the institution of this suit prior to starting to Ottumwa. I stopped at my brother, J. S. Coleman's, as I went up, and there heard from the defendants, who were there, that this suit had been begun. I had a conversation at Ottumwa in the parlor of the convent there, with the plaintiff, at the time of my visit. There was a board partition in the room made of square pieces, about an inch square, with spaces of two or three inches between. She was on one side of this and I on the other. In that conversation the matter of the execution of a deed from plaintiff to Virginia Summers, her mother, was brought up. She said she only gave it to her ma for her lifetime, and I asked her if she did not read it, and she said she did. She said when she came to the words "heirs and assigns," she asked her ma what it meant, and her ma said " you are my heir." I don't think there was any one present at this conversation, except ourselves.

The evidence in this case upon the question of the intention and understanding and purpose of the parties in making the deed sought to be set aside, is nearly all on one side. If the witnesses are creditable, and there is no effort made to show the contrary, then but one conclusion can be reached. Here are six witnesses; five of them inmates and officers of the convent in which the plaintiff is a sister, in which all property is held in common; and therefore supposed to be more or less interested in the final determination of the suit; the sixth, the attorney of the institution and a notary; all present, all understanding that the deed was conveying only a life estate, and permitting it to be executed and delivered. These witnesses must have believed what they testified to. It is reasonable to suppose that if they had been aware the plaintiff was making an absolute deed, they would have so informed her at the time, be-

fore she signed and acknowledged it.    If she could have been prevailed upon, as her letters clearly show she might, would not the Mother Superior, the sisters, the priest, the lawyer, have then and there prevented the execution and delivery of this deed, rather than now, by wholesale perjury, undertake to set it aside?    The evidence clearly shows misunderstanding and mistake and constructive fraud.    One witness says the plaintiff read the deed and when she came to the clause " unto the said Virginia Summers, her heirs and assigns absolutely," she said, " why mother, what does this mean, I intended for this property to come back to me when you die?"    And the mother answered:  "You are foolish, my child, don't you know that you are my only child and heir?    It is not necessary to put in the deed Mary E. Summers."    This, I think, is entirely consistent with fairness and good faith.    It was true that Mary E. Summers was her only child and daughter, and if the mother had died without making a will, the daughter would have inherited her mother's estate.    Before we can reach the conclusion that Virginia Summers was at the time of the execution of this deed intending to deceive her only daughter ; was then trying to mislead the Mother Superior, the sisters, the priest and lawyer, we must presume that she was wily enough to concoct and carry out a scheme by which she would obtain the absolute title to the property, keep back the deed from record and by will divert its direct descent from the daughter.    True, she did make a will in favor of defendants, but not until November 14th, 1876.    She died December 1st, 1876, and after her death the deed was recorded on December 5th, 1876.    Is it not more reasonable as well as more charitable to conclude that this claim of absolute title arose long after the deed was procured ; long after she had seen her daughter, and possibly when making her will on a bed of sickness?    But however that may be, it is very conclusive to my mind that Mrs. Summers represented that she was only seeking a life estate, and equally clear that plaintiff believed she was only con-

veying the same interest. If this be true, and it was an honest mistake and misapprehension as to the facts on both sides; or if the transaction was reeking with fraud, and the deed was procured by the false and fraudulent representations of Mrs. Summers, the result must be the same; the deed must be set aside. *Young v. Coleman*, 43 Mo. 179; *Cassidy v. Metcalf*, 66 Mo. 519, and authorities there cited; *Griffith v. Townley*, 69 Mo. 13; *Miller v. Simonds*, 72 Mo. 669.

There was objection made on both sides to the introduction of evidence, which we have carefully examined, and while some of it should have been excluded for incompetency and irrelevancy, yet it could not even, if considered, have affected the result of the judgment.

In the view of the case taken by this court, and probably by the circuit court, the question of the sanity or the insanity of the ancestor of the plaintiff, Lewis Summers, was not material.

The judgment below is affirmed. All concurring.