## WILLIAMSON et al., Appellants, v. BROWN.

### Division One, March 30, 1906.

1. **DEPOSITION: Objection to Form of Question.** Under the statute in reference to depositions (sec. 2906, R. S. 1899) objection to the form of the questions, whether they be leading or otherwise, must be made at the time the deposition is taken, or it will not be considered by the trial court or the appellate court.

2. **LIMITATIONS: Against Affirmative Defense.** The rights of a defendant in possession of real estate, who pleads an equitable defense to an action of ejectment or other action affecting his title, and prays affirmative relief based on such defense, are not within the purview of the Statute of Limitations. That statute bars actions, not defenses.

3. **REFORMING DEED: Mistake of Fact: Oral Testimony.** The deed conveyed certain land to "Lemuel Wilkinson," and in the habendum clause "unto Lemuel Wilkinson and Orpha Wilkinson, her heirs and assigns, for herself, her heirs," etc. Orpha was Lemuel's wife, and her name nowhere else appears in the instrument except in the habendum clause. *Held*, first, that, taken in connection with the deed, the oral testimony of the grantor taken more than thirty years afterwards, to the effect that it was stated to the justice of the peace who drew the deed that it was the desire of the grantees that the deed convey the property to Lemuel for life with the remainder in fee to his wife Orpha and her heirs, and that it was the desire of himself that it be drawn so as to effectuate the grantee's

wishes, was competent; *second*, the purpose of the transaction, when this deed is read, in connection with the oral testimony of the grantor, was to convey the property to Lemuel for life and the remainder to Orpha and her heirs, and he and she being dead, the deed, in the suit by Lemuel's heirs in ejectment, in which her heir is defendant and sets up affirmative defense, will be reformed in accordance with that purpose.

4.  ————: ————: **Ignorance of Law.** The rule that "ignorance of the law excuses no one" is relaxed in equity and where the instrument reduced to writing, though executed, fails to carry out the intention of the parties and fails to express the contract which the parties actually entered into, equity will reform it so as to express their intentions, although the failure may have resulted from a mistake as to the legal meaning and effect of the terms or language employed in the writing. And where the mistake was a mixed mistake of law and fact, brought about by the ignorance of the justice of the peace who drew it and in doing so acted for both parties, thereby making the mistake mutual, the deed which he drew up for the parties will be corrected to conform to their intentions.

5.  ————: **Holding and Pleading Under Will.** Where a deed made to testator and his wife and her heirs is held to convey to him a life estate with remainder to her and her heirs, the reformation of the deed, giving her heirs the remainder will relate back to its date; and if thereafter the testator makes a will by which he devises the property to his wife for life and after her death to his children and her children in equal parts, the fact that defendant (her son) during her life explained to his heirs the meaning of the will only, and after the death of the wife entered into possession and thereafter claimed to be the sole owner, will not require a holding that he held possession under the will, nor will the fact that in his answer to plaintiffs' ejectment, who claim the entire estate, he brought forward the will for the purpose of calling the court's attention to it and availing himself of his right to claim as one of the devisees under the will in the event he lost in his endeavor to have the deed reformed. Especially should that be the ruling where neither party relied upon the will, but both brought it forward in their pleadings by way of playing for advantageous positions.

6.  ————: **Effect of Habendum: Deed in Suit.** A remainderman may be named for the first time in the habendum clause of a deed, and the estate created by the granting clause may thereby be cut down from a fee to a life estate. But where a deed which in the granting clause named only Lemuel Wilkinson as the grantee and in the habendum clause said the estate was to be held "unto Lemuel Wilkinson and Orpha

Williamson v. Brown.

Wilkinson, her heirs and assigns, for herself, her heirs," has been reformed so as to convey the remainder to her heirs, it is unnecessary to decide whether the deed itself, without reformation, conveyed the remainder to her heirs.

Appeal from Putnam Circuit Court.—*Hon. Paris C. Stepp,* Judge.

AFFIRMED.

*Higbee & Mills, N. A. Franklin* and *E. C. Wickless* for appellants.

(1)   The court erred in failing to rule on plaintiffs' objections to the introduction of portions of the deposition of John Hawk, that the understanding was at the time the deed was made that the land was to go to her, Orpha's, heirs.  In the absence of clear, positive and convincing evidence to the contrary, the deed is conclusively presumed to express the contract as made.  The deposition was taken ex parte thirty-six years after the deed was made; the question was leading and put the answer in the mouth of the witness on a vital issue.  No ruling was ever made on this and other objections, and exceptions were taken at the time. Asbury v. Hicklin, 181 Mo. 670.  (2)   The evidence was wholly insufficient to warrant the court in reforming the deed from John Hawk to Lemuel Wilkinson.  It rests wholly on the testimony of John Hawk, given more than thirty-six years after the deed was executed. He repeatedly declared the deed was drawn the way they wanted it.  He says Mrs. Wilkinson said they wanted it to go to her heirs at their death.  She said his children had had their shares.  He cannot say that Lemuel was present when she said this.  Then by the most direct cross-examination they get the witness to say this was the understanding when the deed was made.  It is unthinkable that a court would divest title on such testimony after so long a time, especially in

view of the fact that defendants have clearly proven that Lemuel always considered he owned the fee, gave it by will to his three children and his wife's two children, and defendant in his letter declared his mother held it during her life under the will. (3) The action to reform the deed was clearly barred by limitation. (4) The deed by the premises conveyed the fee to Lemuel Wilkinson. The habendum might have provided a remainder to Orpha. "A person who is not named in the premises as a grantee may take by way of remainder, but where the grant is to one person, the habendum cannot be operative when it is to him and another to take as joint tenants, or tenants in common. In a case of that character the habendum would be at variance with the grant." 1 Devlin on Deeds (2 Ed.), secs. 219, 220, quoted in Utter v. Sidman, 170 Mo. 292. A stranger to the deed may take by way of remainder though not named in the premises. Ibid 293, 297; 9 Am. and Eng. Ency. Law (2 Ed.), 140, 141; Miller v. Dunn, 184 Mo. 323.

*H. G. Orton* and *Ira B. Hyde* for respondent.

(1) Mistake has from the beginning of equitable jurisprudence been a favorite ground for the award of equitable remedies. Eaton on Equity (1 Ed.), p. 256. (2) It is not material whether the instrument is an executory or executed agreement; nor is it material whether the proceeding is directly by bill to correct the mistake, or the mistake is set up in the answer by way of defense, as in this case. Leitensdorfer v. Delpha, 15 Mo. 160; Barlow v. Elliott, 56 Mo. App. 374. (3) A mistake in written instruments caused by the ignorance, mistake or negligence of the draughtsman will be corrected in equity. It does not matter whether the draughtsman was the agent of the party seeking the correction or the other party. 15 Am. and Eng. Ency. Law (1 Ed.), 673, 674; 18 Enc. Pl. and Pr. (1 Ed.), 773.

(4) The court has held that a mistake of a conveyance will not constitute a mutual mistake as a ground for reformation of the instrument unless he acted for both parties. In this case it is clearly shown by the deposition of Hawk that the justice did act for both parties — that they were all present before the justice and stated and agreed that the deed was to be so drawn that the land should belong to the heirs of Orpha Wilkinson, to the exclusion of Lemuel Wilkinson's heirs, and this the justice undertook to accomplish, and all the parties supposed he had so drawn it. Benn v. Prichett, 163 Mo. 560. (5) It is not necessary, in order to establish a mistake in an instrument, to show that particular words were agreed upon to be inserted; it is sufficient that the parties had agreed to accomplish a particular object, and that the instrument as executed· is insufficient to effectuate their intention. Leitensdorfer v. Delpha, 15 Mo. 160. (6) Mistakes of law as well as of fact will be corrected in proper cases. Corrigan v. Tiernay, 100 Mo. 276; Eaton on Equity (1 Ed.), 261, 262; 14 Ency. Pl. and Pr. (1 Ed.), 35, 36; 18 Ency. Pl. and Pr. (1 Ed.), 779; Griffith v. Townley, 69 Mo. 13. (7) This deed plainly shows upon its face that an attempt was made to vest the remainder in the heirs of Orpha Wilkinson. The intent of the parties controls. Miller v. Dunn, 184 Mo. 323; Utter v. Sidman, 170 Mo. 284. (8) It is a well-established principle that parol evidence is admissible to prove mistake, fraud, accident, or surprise in the execution of written instruments. 15 Am. and Eng. Ency. Law (1 Ed.), 649; Eaton on Equity (1 Ed.), 278. (9) When a printed form is used, as in this case, the parts of an instrument that are written are entitled to a higher consideration than the printed portions. Where there is a conflict, the written will prevail. 2 Devlin on Deeds, sec. 837; 1 Beach on Modern Law of Contracts, sec. 728. (10) The Statute of Limitations cannot be pleaded against one in possession. It runs only against one out of pos-

session, beginning to run from the time of ouster. It bars actions, not defenses. Michel v. Tinsley, 69 Mo. 442; Dunn v. Miller, 96 Mo. 324; Cooper v. Deal, 114 Mo. 527; Butler v. Carpenter, 163 Mo. 597. (11) Under the rule in the State a grantee may be named in the granting part or premises, while the fee may be made to pass to a different person. McCullock v. Holmes, 111 Mo. 445. This case is on all fours with the case at bar. See, also, Miller v. Dunn, 184 Mo. 318; Utter v. Sidman, 170 Mo. 384.

LAMM, J.— Lemuel Wilkinson and his wife, Orpha, immigrated to Putnam county, Missouri, about the year 1867, and resided there and in a neighboring county until they died, Lemuel dying in 1879 and Orpha in 1897. Orpha Wilkinson was twice married, being united by her first marriage bonds to one Brown, and bearing two sons to him, to-wit, Nevill and James R., the latter, respondent here. Lemuel Wilkinson was the husband of a former wife, Hannah, who died about the breaking out of the Civil War. By Hannah, he had two sons and one daughter, who, living to maturity, begot children and died. These children, grandchildren of Lemuel Wilkinson, are appellants here. The controversy, one pertaining to real estate, thus becomes one between the grandchildren of Lemuel Wilkinson, on one side, and his stepson, James R. Brown, who claims to hold in his own right and by conveyance from his brother Nevill, on the other side.

This suit is to determine the estate, title and interest of the respective parties in and to, and to recover possession of certain parcels of land in Putnam county, Missouri, described in the petition as follows: the southwest quarter of the southwest quarter of section 15, and the north half of the northwest quarter of the northwest quarter of section 22, and fifteen acres and twenty-four poles off the west side of the northwest quarter of the northwest quarter of said section 22,

all in township 66, range 22; and the west half of the
northwest quarter of the northeast quarter of the north-
west quarter of section 18, in township 66, range 21 —
the petition being in two counts, one in ejectment, the
other in the nature of a bill in equity to ascertain and
determine title — plaintiffs claiming the whole title.

The answer is a general denial with certain af-
firmative pleas, one being in the nature of a cross-bill
asking for affirmative relief, and is to the effect that
on the 30th day of September, 1867, one John Hawk,
with his wife, executed to Lemuel and Orpha, his wife,
a warranty deed conveying the following lands in Put-
nam county, Missouri: (here follows a description of
lands the same as in the petition, except that the fifteen-
acre tract, referred to in the petition, is by the answer
set down as a nine-acre tract and described as a part
of the northeast quarter of the northwest quarter of
section 22, commencing at a given point and running
with the meandering of Barber creek, and other metes
and bounds, not necessary to set forth here; and except,
further, that the last tract in the petition is described
in the answer as, "also 10 acres out of the northwest
corner of the northwest quarter of the northeast quar-
ter of section 18, township 66, range 21." It may be
said at this point that the decree follows the land de-
scriptions in the answer and in the Hawk deed, which
seem to be the true ones.) That said deed was for a
valuable consideration paid to said Hawk by Lemuel
and Orpha Wilkinson. That it was then and there the
mutual intention and agreement between the Wilkinsons
and Hawks that said deed was to be made so as to
convey a life estate in said land to Lemuel, with re-
mainder to Orpha, so that, *her* heirs would inherit to
the exclusion of *his*. That by mutual mistake the grant-
ing clause of the deed was so written as to convey the
fee in said land to Lemuel, but the habendum was writ-
ten so that Lemuel Wilkinson and Orpha Wilkinson
and "her heirs" should have and hold said land; that

the parties trusted the scrivener, acting therein for all of them, to write said deed according to their mutual intent and agreement; that they were ignorant and supposed said scrivener had written the deed to evidence their agreement; that said scrivener was John L. Thomas, a justice of the peace, now dead; that the deed, as written, did not express the mutual intent of the parties but was executed by Hawk and wife and received by Lemuel and Orpha Wilkinson under a mutual mistake of fact as to the interests in said land conveyed to Lemuel and Orpha Wilkinson respectively; and that the deed should be reformed so as to conform to the said mutual intent and agreement.

The answer pleads, also, that Nevill Brown and the defendant James R., brothers, are the only children and heirs of Orpha Wilkinson, who died in the year 1897, and that defendant had acquired the interest of Nevill in said land; and, moreover, pleads that Lemuel Wilkinson died in 1879; that all his children are dead; that the plaintiffs are his grandchildren; that their only claim of title in said land is derived from inheritance from said Lemuel, and that Lemuel left a will which has been duly probated and by which he provided and directed that his property, real and personal, should be sold and the proceeds divided among certain legatees; and that plaintiffs are not entitled to the possession of any land of which Lemuel Wilkinson died siezed.

The answer further sets forth that, since the death of Orpha Wilkinson, defendant has been in possession of said land as the owner in fee simple, and further averred that, in consideration of the provisions of the Hawk deed, the defendant for many years worked and cared for said Lemuel and Orpha Wilkinson in their declining years, performing services of value, to-wit, $1,000.

The prayer of the answer is for general relief and specifically that the Hawk deed be corrected and re-

formed so as to conform to the said intent and agreement of the parties thereto, and to divest out of plaintiffs and into the defendant all the right, title and interest of plaintiffs in the land.

By reply, plaintiffs admit the execution of the Hawk deed, the deaths of Lemuel and Orpha Wilkinson, that plaintiffs are the heirs of Lemuel, that defendant and Nevill Brown are the only heirs of Orpha who was the widow of Lemuel, and that plaintiffs claim title as heirs of Lemuel Wilkinson; and aver that Lemuel made a will devising said real estate to his own children and to the children of Orpha Wilkinson, in equal shares, subject to a life estate in Orpha, who held possession, after the death of Lemuel and during her own lifetime, under said will. But they deny every other allegation in the cross-bill. Plaintiffs then say that the cross-bill does not state facts sufficient to constitute a cause of action, that the three-year Statute of Limitations bars the defendant's cause of action, stated in his cross-bill, and that the ten-year Statute of Limitations is also a bar.

On paper issues thus outlined, the learned chancellor, on a hearing below, found for defendant and reformed the Hawk deed. From this decree, plaintiffs appeal.

At the trial, in addition to the admissions made by the pleadings, the following facts were uncovered:

In 1865 Lemuel Wilkinson and Orpha, his wife, deeded certain real estate in Indiana to the ancestors of some of appellants. These conveyances were made for an inadequate consideration in cash, and, presumably, somewhat by way of advancement. He had a married daughter, Charity, whose descendants are also appellants, and who received nothing from her father. Coming to Missouri in 1867, negotiations were opened with John Hawk for the real estate in question, as well as another tract lying close by in Mercer county. The

evidence tends to show that Lemuel Wilkinson brought some money with him to Missouri. There is no evidence indicating what means, if any, Orpha Wilkinson had before her marriage to Lemuel, or acquired afterwards. All parties to the Hawk transaction, including the scrivener, are dead except John Hawk and his wife. The deposition of John Hawk was taken and introduced by respondent.

Appellants, to sustain the issues on their part, read in evidence the Hawk deed and rested, and, as one of the principal contentions in the case is over the construction of this deed, we will have it printed in full with this opinion. The form used was a printed blank and certain writing was inserted into the blanks and certain erasures were made and interlineations written in, which claim attention as of significance. The written portions of the deed appear here in italic type and the erasures and interlineations are shown below. The deed, the original of which was exhibited to this court, is as follows (omitting the acknowledgment):

"KNOW ALL MEN BY THESE PRESENTS,

that *I, John Hawk and Catherine Hawk,* his wife, of the county of *Putnam,* State of Missouri, have this day, for and in consideration of the sum of *one thousand* dollars, to the said *John Hawk,* in hand paid by *Lemuel Wilkinson,* of the county of *Putnam,* in the State of *Missouri,* granted, bargained, and sold, and by these presents do grant, bargain and sell unto the said *Lemuel Wilkinson,* the following described tracts or parcels of land, situate in the county of *Putnam,* in the State of Missouri, that is to say: [Here follows description of land sold.]

"To have and to hold the premises hereby conveyed with all the rights, privileges and appurtenances thereto belonging, or in anywise appertaining, unto the

*her*

said *Lemuel Wilkinson and Orpha Wilkinson,* ~~his~~

*heirs,* and assigns forever, I, the said John Hawk, covenanting to and unto the said *Lemuel Wilkinson and*
*her*
*Orpha Wilkinson,* ~~his~~ heirs and assigns for
*herself, her*

~~himself, his~~ *heirs,* executors and administrators, to warrant and defend the title to the premises hereby conveyed against the claim of every person whatsoever.

"In witness whereof, *we* have hereto subscribed our names and affixed *our* seals this 30th day of *September,* 1867.

*"John Hawk.*
*"Catherine Hawk."*

The testimony of John Hawk is as follows:

"My name is John S. Hawk; my age seventy-one years; I live in Chillicothe, Missouri; am a retired farmer and have no particular business at present. I knew Lemuel and Orpha Wilkinson. They lived in the west end of Putnam county. I got acquainted with them shortly after the Civil War, at which time I sold them the farm on which they lived. It was located partly in Putnam county and partly in Mercer county. There was one eighty of it in Mercer county.

"Q. Now look at this deed and see if you ever saw it before? (Attorney hands witness deed, dated September 30, 1867, signed by John Hawk and Catherine Hawk and recorded in office of recorder of deeds of Putnam county, Missouri, in book 7, at pages 8 and 9.) A. Yes, sir; that is the deed I made to him to the land in the west end of Putnam county. We made him another deed to the land in Mercer county. John L. Thomas, a justice of the peace, now deceased, wrote this deed. This deed was made out but a short time before I got acquainted with Mr. Wilkinson and his wife. I have examined this deed carefully; so far as I can tell it is the same form and writing as it was when I signed it. There have been no changes in it.

"Q. You will note in that deed that provision in it, in the latter part of it, that is to go to her heirs. Do you recollect what was said by the parties at the time it was made and why it was made that way? A. They said it was their desire to have it that way, and I made the deed the way they wanted it. Mrs. Wilkinson said that they wanted it to go to her heirs at their death, that his heirs had had their share.

"Q. Now was he present at the time? A. They were both present if it was at the time of the making of the deed, and I think that was the time. She said that his children had had their share and that it was to go to her heirs. That was the talk at the time the deed was made and they erased one part and put in the provision that it was to go to her heirs. The word "his" was erased and the word "her" was put in. I don't remember ever talking with Wilkinson about this land thereafter. I suppose the deed to the land in Mercer county mentioned the same provision as to whom it should go at their death as it was all included in one contract.

"Q. Was that the understanding at the time the deed was made that the land was to go to her heirs? A. Yes, sir. They said how they wanted it and I made the deed the way they wanted it. I think the deed to the Mercer county land was to be drawn the same way. It was all in one contract. We were talking about both tracts as one. We made separate deeds to the land in Putnam and Mercer counties, because the Putnam county justice of the peace, who drew the deed to the Putnam county land, could not take acknowledgments out of his own county. They took possession of this land soon after I sold it to them and they lived there until Wilkinson died. I have no interest whatever in the result of this suit. It is of no interest to me whether the heirs of Lemuel Wilkinson or of Orpha Wilkinson get it. This deed I have referred to was made on the date it purports to have been made on, in September,

1867. My full name is John S. Hawk, but I see that I executed the deed in the name of John Hawk which is the way I signed myself in those times."

As said, the testimony of Hawk was by way of deposition, and, when offered by respondent, plaintiffs objected to a certain question and answer for the reason that the question was leading and suggestive. This objection was overruled.

By one Pauley, it was shown that Lemuel Wilkinson stated, in 1870, or thereabout, that he intended his Mercer county land for "Jim Brown" (respondent) and the Putman county land "for Mr. Jim and Mr. Nev. Brown at his death. They were to care for him and the old lady, and the land was to go to Jim and Nev. Brown at the end of his life." We deem the evidence of this witness of no probative force and, therefore, omit its details. Defendant also introduced the will of Lemuel Wilkinson, reading thus:

"I, Lemuel Wilkinson, of York township, in the county of Putnam, and State of Missouri, being of sound mind and conscious of the uncertainty of this life, make this my last will and testament — that is to say —

"First, after all my lawful debts are paid and discharged, I give, bequeath, and devise my estate, both real and personal, to my wife, Orpha, during her natural life, after her death it is my will that all my real and personal property be sold and that sixty dollars of the proceeds be paid to my daughter, Charity Hammer, and fifty dollars to my step-son, James R. Brown, and that the residue of my estate, after making the above payments be divided equally among my three children and two stepchildren, to-wit, James E. Wilkinson, Hezekiah Wilkinson, Charity Hammer, Nevill Brown and James R. Brown.

"I appoint James R. Brown, of the county of Mercer and State of Missouri, executor of this my will.

"In witness whereof, I have signed and sealed and

published and declare this instrument as my will at my home in the township of York, county and State as aforesaid.

"Dated this 29th day of November, 1873."

It was admitted at the trial that Lemuel Wilkinson lived on the land in controversy and died there, and "that the widow continued to control it until her death . . . since which time it has been in the possession of the defendant."

Oral testimony was introduced tending to show that Lemuel Wilkinson's health was very poor; that he was not able to do any work after coming to Missouri; that respondent looked after him and his family and transacted his business; and that he had made small improvements on the land. On cross-examination of one witness, a nephew of respondent, appellants' counsel identified and introduced certain letters from respondent, one dated August 22, 1893, and directed to someone whose name is not disclosed, but who evidently was interested in the estate and would seem to be a son of Lemuel Wilkinson. It was written in answer to an inquiry, and refers to Lemuel Wilkinson's will, to its terms, to the value of the land as $800, to the fact that his mother, Orpha, holds it during her life, and is now in good health, and offers $100 to his correspondent, for his share, adding, "please remember that I am not making you a sure offer as I don't want to buy," and refers his correspondent to certain attorneys at Princeton, Missouri, with whom he could correspond, at his choice.

Another letter, written after Orpha Wilkinson's death to a son of Lemuel Wilkinson, bearing date of January 27, 1899, reads as follows:

"Dear Sir: I write you in regard to the matter of your father's estate. I find since mother's death that when your father and mother bought the farm on which he died, that he had it deeded to him and her

and to her heirs. This you will find from the record at Unionville, Putnam county, Missouri, John S. Hawk and wife to Lemuel Wilkinson et al. This land is worth about $1,200. Mother paid out of the property allowed her as widow about $200 doctor bill and funeral expenses, tombstone, etc. She lived on the farm and there is a doctor bill against her of $320, I hear. I have bought my brother's share of the land for $100. I feel that I would be willing to pay you folks what is right if we could agree as I don't seek an advantage of you if the deed does say so. When you investigate this let me hear from you. Yours.''

This was followed by two more, thus:

"Princeton, Mo., Feby., 1899.
''Mr. A. W. Hammer,
    ''Willow, Indiana.
''Dear Sir: Yours of Feby. 4, 1899, rec'd and in answer would say that I have nothing different to say from what was said in my letter to Hezekiah Wilkinson on the 27th of January. I gave the facts in that letter as to the entire business. In that letter you will notice the debts that are to be paid. You may wonder what became of your grandfather's money. This should not be a wonder when you remember his nature. He kept his money and would not loan it at good interest and it was used, a few dollars at a time, until gone. He lost about $300 with a merchant and that scared him out of loaning. Now if you people will all join in a deed to me to the land I will pay $300. I think I could hold the land under the deed as it now stands, but it would cost me about as much and in case you folks recovered, it is more than you would get after all debts and costs are paid. I offer this as a compromise. Please write me at once and give me Milton's address.
        ''Yours truly,
            ''Jas. R. Brown.''

"Feby. 5th.

"Hon. J. D. Johnson,

"Unionville, Mo.

"My Dear Sir: Your letter of the 4th inst. received and, in reply, will say that Mrs. Orpha Wilkinson died Nov. 4, 1897, owning personalty of no value, and real estate the title to which you can determine by examining warranty deed record 7 pages 8 and 9, leaving as her heirs, Nevel Brown and myself. Having purchased brother's interest before her death I am the onwer in fee simple to this land.

"Yours resp.

"JAMES R. BROWN."

"Princton, Mo.

"Per PERRY.

Other oral evidence was directed to the rental value of the land, to the number of acres in cultivation and to the character of the soil and extent of the improvements put on the land by respondent, all of which we deem immaterial to the issues presented to us.

On the foregoing record facts, did the chancellor solve his problem correctly? We think he did, and this, for the following reasons:

I. By Revised Statutes 1899, section 2906, relating to depositions, it is provided that objections to competency or credibility of a witness, or the competency or relevancy of any question put to him, or any answer given by him, may be made at the trial of the cause, though not made when the deposition was taken. In effect, to this section the maxim, *expressio unius,* has been applied, and it has, accordingly, been ruled that the right given by statute to object at the trial to the competency or relevancy of any question, excluded the right to object to the mere *form* of the question. Objections to form, for obvious reasons, should be made at the time the deposition is taken. [Glasgow v. Ridgeley, 11 Mo. 34.] If so made, they must be

renewed at the trial to lay the foundation for a review of rulings, *nisi,* thereon. [Kirton v. Bull, 168 Mo. 622.] Hence, we need not consider appellants' objections to certain questions in Hawk's deposition, inasmuch as such objections seek only the form and not the substance of the question and answer.

II. It is contended by appellants' learned counsel that the Statute of Limitations is a bar to the affirmative relief sought by respondent in the reformation of the deed from John Hawk and wife to Lemuel Wilkinson. To this contention, respondent replies that the rights of a defendant in possession of real estate, who pleads an equitable defense in an action of ejectment or other action affecting his title, and prays affirmative relief based on such defense, are not within the purview of the Statute of Limitations — briefly stated, that a Statute of Limitations bars actions, not defenses. In our opinion, respondent's insistence should be allowed under the facts in judgment, and under the authority of Butler v. Carpenter, 163 Mo. 597, and cases cited. In that case it was said: "A ground of defense never becomes stale or barred by the Statute of Limitations, but grows in strength and force as the limitation period against a right of action widens. The Statute of Limitations may be used by a defendant as a shield for his protection or defense, but is never to be turned upon him as a sword with which to compass his defeat."

III. The oral evidence, standing alone, may be allowed to be wholly insufficient for the reformation of Hawk's deed, under the stringent rules adhered to by this court, but the uncontradicted evidence of John Hawk, taken in connection with the deed he executed, is another matter. That deed is, indeed, a *speaking* instrument; for it shows that the granting clause ran to Lemuel Wilkinson, while in the habendum clause, for the first time, the name of Orpha Wilkinson appears. Not only so, but, after her name once appears,

there followed erasures and interlineations clearly
pointing to a preconceived and present intent to, in
some way, limit the estate as one, at least, in remainder
over to her and her heirs and thus to modify the fee-
simple title set over in the premises of the deed
to Lemuel Wilkinson. The reformation sought and de-
creed by the lower court was to so reconstruct the deed
as to make all its parts conform to the intent and
agreement between the Hawks and the Wilkinsons. The
gist of the evidence of John Hawk was that the Wilkin-
sons wanted a deed written that would have the effect
of giving to Lemuel Wilkinson a life estate with a
remainder over to his present wife, Orpha, and her
heirs to the exclusion of his. Whether the grounds and
reasons for that form of a conveyance were sound or
unsound is an immaterial matter, in our opinion, on
the facts of this case; because they had the legal right
to make such arrangement. They went to a justice of
the peace and stated their wants to him. Mr. and Mrs.
Hawk were willing to put the conveyance in any form
desired by the Wilkinsons. It must be apparent to
the judicial mind that the justice of the peace, in ignor-
ance of the law, made a mistake of fact in writing the
deed, and instead of writing a deed plainly granting
the land to Lemuel Wilkinson for his life with re-
mainder over to Orpha, his wife, and her heirs, he
tried to effectuate the agreement by writing Orpha
Wilkinson's name in the habendum clause with that of
her husband, and thereafter, wherever the expression
of "his heirs" occurred, the "his" was striken out and
her was written over the same. So intently and per-
sistently did the uninformed mind of the justice run
on this idea that in the warranting clause he struck out
the pronouns "his" and "himself," having for their
antecedent "John Hawk," and wrote in the pronouns
"her" and "herself."

It is a legal commonplace that ignorance of the law
excuses no man, but this is a hard saying, much mur-

mured against, and the rule is relaxed in equity. Judge Story (1 Story's Eq. Juris. [13 Ed.], sec. 115), says: ". . . for where an instrument is drawn and executed which professes or is intended to carry into execution an agreement previously entered into, but which by mistake of the draftsman either as to fact or to law does not fulfill that intention, or violates it, equity will correct the mistake so as to produce a conformity to the instrument."

Speaking to the same point, BLACK, J., says for this court in Corrigan v. Tiernay, 100 Mo. l. c. 280-1:

"The point pressed upon our attention is, that, according to the answer, Patrick Tiernay had full knowledge of all of the facts, and the mistake was simply a mistake of law in supposing the deed would convey the title to him and his wife jointly. It is a well-established general rule that a court of equity will not grant relief against a mistake of law unmixed with any mistake of fact. [Price v. Estill, 87 Mo. 378; Norton v. Highleyman, 88 Mo. 621.] There are, however, some exceptions to this general rule. Cases arise where there is a mixed mistake of law and of fact in which relief will be granted. Thus in the case of Griffith v. Townley, 69 Mo. 13, an administrator sold land of his intestate, supposing that it was the fee that he was selling, and the purchaser supposed that it was the fee that he was buying. It transpired that nothing passed by the sale but the equity of redemption. It was held there was such a mutual mistake of fact and law as entitled the purchaser to relief. [See, also, Cassidy v. Metcalf, 66 Mo. 519.] But it is not necessary to a disposition of the case in hand to follow out the many distinctions taken in the class of cases just mentioned. If an agreement is what the parties thereto intended it should be, equity does not interfere because the parties did not understand its legal effect. 'The principle underlying the rule is,' says Mr. Pomeroy, 'that equity will not interfere for the purpose of carrying out an intention

which the parties did not have when they entered into the transaction, but which they might or even would have had, if they had been more correctly informed as to the law.' [2 Pom. Eq. Jur., sec. 843.] A different case is presented. where the instrument, as it is reduced to writing, fails to express the contract which the parties actually entered into. In such cases equity will reform the contract, and this, too, though the instrument fails to express the contract which the parties made by reason of a mistake of law. Says the author last named: 'In short, if a written instrument fails to express the intention which the parties had in making the contract which it purports to contain, equity will grant its relief, affirmative or defensive, although the failure may have resulted from a mistake as to the legal meaning and operation of the terms or language employed in the writing.' [2 Pom. Eq. Jur., sec. 845.] "

Nor is it material whether the instrument sought to be reformed is an executed or executory agreement, nor whether the proceeding to reform is by way of a bill to correct a mistake, or by way of an answer as a defense asking affirmative relief. The rule announced by GAMBLE, J., in Leitensdorfer v. Delphy, 15 Mo. l. c. 167, cited by the learned counsel of respondent, is wholesome and to the point, and, therefore, may be attended to with profit, viz.:

"If words of inheritance were necessary in order to reinvest Fournier with the fee simple of the land which had been conveyed to Denoyer, then such words were omitted by mistake. It was not necessary, in order to establish a mistake in an instrument, that it shall be shown that particular words were agreed upon by the parties as words to be inserted in the instrument. It is sufficient that the parties had agreed to accomplish a particular object by the instrument to be executed, and that the instrument as executed is insufficient to effectuate their intention. The power of a

court of equity to reform an instrument, which by rea-
son of a mistake fails to execute the intention of the
parties, is unquestionable. It is not material, whether
the instrument is an executory or an executed agree-
ment; nor is it material whether the proceeding is di-
rectly by bill to correct the mistake or the mistake is
set up in the answer by way of defense . . . . Al-
though it is said that the evidence required to prove
a mistake when it is denied must be as satisfactory as
if the mistake were admitted, yet this and similar re-
marks of judges, however distinguished, form no rule
of law to direct courts in dispensing justice. When the
mind of a judge is entirely convinced upon any dis-
puted question, whether of fact or law, he is bound to
act upon the conviction.''

Applying the foregoing equitable principles to the
facts disclosed by the evidence and found to exist by
the chancellor, we are of the opinion, and so hold, that
ignorance of the law on the part of the justice of the
peace created a condition of things in which there was
a mixed mistake of law and fact, which, as the justice
was the agent of both parties, became a *mutual* mistake
and subject to correction in equity. [Benn v. Pritchett,
163 Mo. 560.]

But it is urged by the learned counsel for appel-
lants that the will of Lemuel Wilkinson treated this
land as belonging to himself and as the subject of a
devise, and that respondent Brown was legatee and a
devisee under that will and held under the will, and not
otherwise. To sustain this contention, we are referred
to the letter written by respondent in 1893. It may
be admitted that if Brown held possession as a tenant
in common with his co-devisees under that will, or only
claimed to derive title under that will, then a mere
change in his mental attitude would not be a sufficient
assertion of a hostile title in himself. He would have
to go further and show acts of such unequivocal char-
acter and of such inherent nature as to impart informa-

tion and give notice to his co-tenants of actual disseizin. [Coberly v. Coberly, 189 Mo. 1. c. 16, et seq.]

But this principle does not assist appellants in this case because said letter of respondent was written at a time when he was not in possession. It was in response to an inquiry and was but giving his own judgment on the condition of part of the record, to-wit, the will. It says that the mother can hold possession during her life, but whether that possession was under the will, or under the deed, or under her right of quarantine or. dower, or under a statutory right of homestead, the letter does not say, and is not shown by the record. Presently after taking possession respondent outlined his contentions and made·full disclosures, as shown by his subsequent letters referring to the deed, and bases his claim thereon, though he offers a compromise, so that it cannot be said that respondent took or held possession under the will, as contended by appellants. ·

We do not consider the will an obstacle in the road of granting the relief prayed by respondent; because, if the agreement was as shown by the testimony of John Hawk, and as further persuasively indicated by the deed itself, then equity will consider that done which should have been done—in other words, will treat the case as if the right kind of a deed had been written, evidencing the true agreement and intent of the parties at the time. In this view of the matter, it is self-evident that the will of Lemuel Wilkinson, made long subsequent to the conveyance, could not dispose of the fee in the real estate; for his will only became operative at the precise moment of time his estate for life lapsed, to-wit, at his death.

Appellants' learned counsel fall into another inadvertent error in supposing that, as a matter of pleading, respondent should be held to claim and hold possession of the *locus* under the will. True it is, respondent pleads the will, but his answer shows that

the will is brought to the attention of the court, and that respondent's position thereon, as shadowed forth in his answer, is circumspectly shaded into colorless neutrality. It must be evident that all parties were somewhat playing for position by their pleadings anent the will. For example, appellants say nothing about the will in their petition. They plant themselves on descent cast as heirs of Lemuel Wilkinson, and rely on the deed and its construction. They claim sole ownership. They say respondent has no title at all, and they ask the court to give them full possession and decree them the full title, cleared up. Plainly, therefore, appellants determined, of set purpose, that if the will got into the case, it must be brought in by respondent. On the other hand, respondent faced this situation: if the chancellor refused to reform the deed, or if the chancellor construed the deed in accordance with appellants' contention, then, unless the will was brought before the court, respondent's right would be cut up, root and branch, even his right under the will. So, too, if respondent claimed under the will alone, then he would by that token become a tenant in common with appellants and the decree would go in accordance with the terms of the will. In this delicate fix, with all parties eying the will askance, respondent, as we see it, determined to stand on the deed and on his right of reformation, but he brought the will to the attention of the court by way of casting anchor to the windward, so that, if his other contentions were not adopted by the chancellor, full disclosures would be before the court on which a decree might rightfully proceed. In this condition of the pleadings, we knew of no rule from which it follows that respondent (at least in the absence of a motion to elect on the ground of inconsistency) should be held to claim and hold possession under the will alone. Pleadings are no longer interpreted harshly and under the maxim *contra proferentem,* but are construed liberally, so as to give each litigant the benefit of fair

intendments and of all principles of law and equity applicable to the several positions taken in the pleadings and sustained by the proof.

To sum up on the question now in hand, we hold, as said, that there was no insurmountable legal obstacle in the way of reforming the deed. We hold that the evidence was sufficient to warrant the chancellor in reforming that deed; and, in so holding, we give effect to the propositions hereinbefore announced as well as to the rule that the written parts of an instrument, in cases of doubt or repugnancy, control the printed parts. [1 Beach on Modern Law of Contracts, sec. 728; Davidson v. Manson, 146 Mo. l. c. 618, and cases cited.] We hold, furthermore, that the condition of the pleadings and proof does not sustain appellants' insistence that respondent held under the will or based his rights upon the will. These holdings seem to cover and dispose of the vital issues in the case.

IV. It is contended, however, by respondent that, under the doctrine pronounced in Utter v. Sidman, 170 Mo. 284, and the cases leading up to and following it, a proper construction of the deed, without a reformation, would give respondent title as the heir of Orpha Wilkinson and as purchaser from his co-heir, Nevill Brown. The doctrine of that case is, in a nutshell, that the old cast-iron general rule, that, if there be a repugnancy, the first words in a deed and the last words in a will shall prevail, no longer obtains in Missouri. The old rule, together with the modern rule, as aptly formulated by MARSHALL, J., in the Utter case (p. 294), is as follows:

"In short [under the old rule]—a grantor might convey as he pleased and his intention and wishes would be observed by the courts, but with this qualification, that he must express his intention in set and technical language and at the proper places and in the right order and clause of the deed. Failing so to do, the

courts did not feel called on to bother about his intention, but took what he said first as expressing conclusively his intention and discarded everything else as void for repugnancy. Such a rule of construction made it almost impossible for anyone except a very expert conveyancer to draw an instrument that would stand the test of the rule, and likewise made it very easy for the courts in construing complicated instruments, but it is not so clear that the real intention of the grantor was ascertained or effectuated. The modern rule, which prevails in this State, is much simpler and much more calculated to carry out the wishes of the grantor. The intention of the grantor, as gathered from the four corners of the instrument, is now the polar star of construction. That intention may be expressed anywhere in the instrument, and in any words, the simpler and plainer the better, that will impart it, and the court will enforce it no matter in what part of the instrument it is found.''

That a remainderman may be named, for the first time, in the habendum clause of a deed, and that the estate created by the granting clause may be thereby cut down from a fee simple to a life estate, is certainly the modern rule and possibly was the rule under the strict common law doctrine. [McCullock v. Holmes, 111 Mo. 445.]

But, if the deed be subject to reformation, as we have held, it becomes unnecessary in this case to decide whether its proper construction as it stands, without reformation, puts the legal title in respondent, or not.

The decree, *nisi*, was for the right party and is accordingly, affirmed.

All concur.