**Reva L. SHAFFER, Respondent,**

v.

**Norma E. DALRYMPLE et al., Appellants.**

**Leona F. Shaffer, Intervenor.**

**Nos. KCD 26352, KCD 26357.**

Missouri Court of Appeals,
Kansas City District.

March 4, 1974.

William Y. Frick, Kirksville (Frick & Frick, Kirksville, of counsel), and Geoffrey L. Gifford, Green City (Gifford & Gifford, Green City, of counsel), for appellants.

Eugene E. Andereck, Trenton (Pickett, Andereck, Hauck & Sharp, Trenton, of counsel), for respondent.

Before PRITCHARD, P. J., and SWOFFORD and SOMERVILLE, JJ.

PRITCHARD, Presiding Judge.

The basic suit is for reformation of two deeds to real estate, one dated March 23, 1943, conveying 133⅓ acres; and one dated February 13, 1942, conveying 195 acres, to Daniel Leo Shaffer, Sr., deceased. In her second amended petition in addition to the Count I prayer for reformation (because of an alleged mistake of the scrivener of the deeds in omitting her name as a grantee and as a tenant by the entirety with Daniel, Sr., thus not expressing the mutual intent of the parties to the deeds), respondent also alternatively prayed: In Count II for partition of the lands by reason of her statutory allowances equalling more than one-half of the value of the lands; in Count III to enforce a resulting trust of an undivided one-half interest in the lands; and in Count IV to enforce a constructive trust in the lands. The trial

court decreed that both deeds be reformed to include respondent's name as a tenant by the entirety thus: "D. L. Shaffer and Reva L. Shaffer, husband and wife", because of a mutual mistake of respondent and D. L. Shaffer. The issue is whether the evidence was sufficient to sustain the relief granted.

Respondent and deceased were married on March 2, 1938. At that time deceased had four children by a prior marriage, appellants, Paul Shaffer, Norma E. Dalrymple, Wayne Shaffer, and Shirley Hunter, whose ages were then 14, 12, 7 and 3, respectively. Daniel L. Shaffer, Jr., was born of the marriage of respondent and deceased. Leona F. Shaffer was permitted to intervene in the suit upon her allegation that she was a judgment creditor of Wayne Shaffer in the amount of $7,735.00, the Oregon judgment against him being registered in the Mercer County Circuit Court on April 13, 1970, by reason of which she had a legally protectible interest in the real estate.

The case went to trial upon change of venue and disqualification of judge in Grundy County, Missouri, upon these facts: At the time respondent and deceased were married he did not own any land, but was in an arrangement with a loan company raising cattle and hogs on a 50–50 basis. Respondent brought to the marriage 28 head of cattle, her personal belongings, dishes and fancy work. Five days after the marriage respondent deposited $160.00 which she had in her purse when married to "Mrs. D. L. Shaffer", and on August 20, 1938, she likewise deposited $274.60 which was from the sale by her father of some of her calves she had left at home. These funds went into the People's Bank of Mercer, Missouri, and respondent testified that she and deceased did not, during the time of their marriage have any separate bank accounts; the account was joint "D. L. and Reva L. Shaffer, and/or". There was no evidence to the contrary. Respondent also had $750.00 in the Princeton Bank which was used, "For whatever we needed."

About three years after they were married, respondent and deceased decided to buy land of their own. They contacted Gus Davison, who was the local representative for Connecticut General Life Insurance Company, and who showed them several tracts of land. They decided on the purchase of 195 acres known as the Alley farm, and on April 10, 1941, a contract was drawn up between Connecticut General which first recited that only D. L. Shaffer was purchaser, but which contract was signed, "D. L. Shaffer and Reva L. Shaffer" and opposite each of their signatures was the printed word "Purchaser". This contract provided for a $3,000.00 purchase price, with $200.00 down, $800.00 on closing and the balance payable over 10 years. On January 28, 1942, deceased and respondent executed a note secured by a deed of trust on the 195 acres to Gus Davison, trustee for Connecticut General. This deed of trust was later released, and in the interim, payments on the note were made: February 4, 1942, $862.43, by check signed by D. L. Shaffer; February 9, 1943, $190.-00 by check signed "D. L. Shaffer By: Mrs. Dan Shaffer"; and "for final payment ($198.50) on the farm, 195 acres", a check signed: "D. L. Shaffer by Mrs. Dan Shaffer." According to respondent, all of these payments came from their joint bank account. A telephone line right-of-way easement was later executed by both deceased and respondent. Of the payments made, $1,800.00 came from a gift by respondent's father to them to make the payments, and that amount, with an additional $554.45 was deposited in the joint account. Respondent did not tell Davison to put the name of deceased alone on the deed. It does not appear by whom this deed was prepared, but obviously it was sent east for execution by Connecticut General and returned. Respondent testified, "We told him (Gus) to put it in D. L. and/or Reva L. Shaffer, and that's the way we thought

it was all the time." The deed itself was made to D. L. Shaffer alone as grantee.

Then as to the purchase of the 133⅓ acres, respondent's version was: "Q (By Mr. Andereck): You and your husband went to the Meltons for the purpose of negotiating a contract to purchase that Melton farm? A Right. Q Now at that time I am asking you did you tell them to make out the deed just in Dan's name alone? A No. [Objection overruled.] Q (By Mr. Andereck): What did you tell them as to who was buying the farm? A I told them Dan and myself were." The Meltons went to Princeton to have the deed made, and respondent and deceased did not go along. It was before March 23, 1943, when the deal was first made, the Meltons came to the home of respondent and deceased, and the Shaffers gave them a check ($1,510.00 signed by D. L. Shaffer) to bind the deal, and then the Meltons went to Lucien May's office and had the deed recorded, and it was sent through the mail to the Shaffers, as respondent testified. The record of the recorder's office recites that D. L. Shaffer deposited the deed and that it was delivered to him, but there was no evidence that the then recorder made such an entry only upon personal delivery.

Both deeds were kept in a deposit box in the Shaffer home, and respondent did not know they were made to deceased alone as grantee until a short time after his death when she went to buy 20 acres of other land which adjoined.

The deed to the 133⅓ acre tract included a description of 13⅓ acres as being located "in the middle of the southeast quarter of the northeast quarter" of Section 9. This general area was once the home of a Negro person, and was in the middle of Rolla Henry's land. On June 6, 1952, this uncertain 13⅓ acres was conveyed to Henry by deceased and respondent, and Henry gave them a deed as grantees, "D. L. Shaffer and Reva L. Shaffer, husband and wife" to the west 13⅓ acres of the North Half of the Southeast Quarter of Section

9, which latter description adjoined the Melton tract. On June 19, 1948, the Shaffers purchased 20 acres which also adjoined the Melton land from the Porters, with grantees: "D. L. Shaffer and Reva L. Shaffer, husband and wife." On June 28, 1955, deceased's father deeded an undivided one-half interest in 160 acres to "D. L. Shaffer and Reva L. Shaffer, husband and wife," and the other one-half interest to deceased's brother, Charles E. Shaffer, and wife, Laura L. Then on April 20, 1962, the latter couple deeded the north half of the 160 acres, except for 15 feet on its south side, to "D. L. Shaffer, and Reva L. Shaffer, husband and wife."

In addition to the lands and the bank account which as the evidence above shows were jointly held, deceased and respondent had these items of property shown by these documents: A title application to a mobile home, signed by D. L. Shaffer, full name "D. L. and/or Reva L. Shaffer"; a title application to a 1969 four door Pontiac to "D. L. and/or Reva L. Shaffer"; and a license application to a 1964 Chevrolet Pickup Truck, for "D. L. and/or Reva L. Shaffer."

Certain statements were made by deceased concerning how the title properties accumulated during the marriage were held. The oldest son, Paul, who sometime before trial had been injured and thus, according to him was not able to hear and understand questions put to him, first testified that in July, 1968, deceased told him that the land would go to respondent at deceased's death, but he made no reference as to how the title was set up in the event respondent died first. After refreshment of Paul's recollection by counsel he testified that deceased told him that all the deeds to the property were in both their names and if Reva died he got it and if he died she got it. Paul was in default as to respondent's claim of reformation of the deeds, and did not contest it. Paul further testified that deceased told him that if it had not been for the stepmother and the half brother, Daniel, Jr., staying

there he would have had to sell the property a long time ago.

Trilby Mulvaney, a first cousin of deceased, talked business affairs with him and how he had title to the lands he owned several times, up to 2 or 3 weeks before deceased died: "Well, we talked about it and he said he had a joint deed, 'if I would die my property all goes to my wife, and if she dies it all goes to me,' says, 'I owe it to her, she come in here and helped me raise this family, bunch of kids, and she brought in some cattle when I married her, * * *.' "

Claude Alley, with others, had a conversation with deceased about 10 years before his death: "Well, he told us then that he had his it was in joint deeds is the way he had his land fixed, and he told us if anything happened to him then it would go to her, anything happened to her it would go to him. Q (By Mr. Andereck): When you say her, who are you talking about? A Reva, his wife, and that way he said you wouldn't have that probate court costs is the way he told us. Then that's how it come I went home and we took care of a lot of ours that way too because I went to Dan lots of times for advice."

Daniel L. Shaffer, Jr., son of deceased and respondent and who lived and worked with his parents on the farm for many years, testified as to conversations with deceased: "Q Now, what did he say to you as to how the title to his lands were?" (Objection, overruled.) "THE WITNESS: He told me probably two hundred times, maybe more than that, I have no idea, that the land, machinery, cars, 'everything,' he said, 'that we own is in joint deeds, titles, or what have you with your mother and I.' He said, 'This way, if anything happens to me it will go to your mother and she can dispose of it, if she wants to give it all to you you can.' Q Slow down just a minute. A 'And if anything happens to her it will all go to me and I can do with it as I want to.' He brought up the statement many different times, he said, 'If her and I drive down in the car and both got killed therefore it wouldn't be able—the deeds and titles and stuff couldn't be transferred to her because she died at the same time, and therefore all the children would come in,' and he said, 'To the best of my knowledge you would get her half,' it was joint owned, he said, 'You would get all of her half since it is joint ownership, and only come in for ⅕th of the other half which would be my half in the joint ownership.' "

It is true, as appellants contend, that a mistake affording ground for relief by way of reformation must be mutual and common to both parties to the instrument, and that the mutual mistake must be established by clear and convincing evidence. Allan v. Allan, 364 S.W.2d 578, 581[1–5] (Mo.1963), and cases cited. But what appellants seem to argue is that there is a lack of evidence of mutuality of mistake as between the parties grantor *and* the grantees to the two deeds in question. Appellants use these sentences: "However, it needs to be stated preliminarily that the parties with whom we are concerned are plaintiff's deceased husband and arguably, at least, plaintiff herself, *and* the grantors in the two (2) deeds in question, a point which may have been lost on the trial Court."; "The state of mind of the grantors and of Dan Shaffer, Sr. is a blank slate which the moving finger may have approached but on which it certainly never wrote."; and (concerning the respondent's evidence) "None of these matters, however, touched, except tangentially, on the central issues of mutual mistake of fact and the true agreement between the grantors, herself and D. L. Shaffer, Sr." The argument ignores the nature of an action for the reformation of an instrument on the ground of mutual mistake of fact, that the parties *affected* by the mistake are the only ones who are in interest. "It has been held that all parties who possess an actual interest in the matter must be mistaken, but it is enough if the mistake is mutual as between the real parties in inter-

est, or between the parties affected thereby." 76 C.J.S. Reformation of Instruments, § 28C., p. 368; "On the other hand, it has been held that reformation may be sought on the ground of mistake without joining a party to the mistake where it appears that such party no longer has an interest in the subject matter of the litigation, such as in the case of an action between the grantees of a common grantor." 66 Am.Jur.2d, § 100, p. 632. See also 76 C.J.S. Reformation of Instruments § 70, p. 425, stating, "The grantor in the deed sought to be corrected is a necessary party, at least where the conveyance contains covenants of warranty, * * *; but there is some authority restricting the application of this rule and holding that necessary parties to the action *do not include grantors who have conveyed their whole title and interest in the property which will be affected by reformation, * * *.*" (Italics added.) Both Connecticut General and the Meltons, as grantors, conveyed their *entire* interests in the lands by the deeds in question. They were not necessary parties to this suit. Rule 52.04(a), V.A.M.R. The inquiry here is only the sufficiency of the evidence to show a mutual mistake of fact at the time the deeds were made as between respondent and deceased.

█ As to the purchase of the 195 acres of land from Connecticut General the evidence is clear, convincing and uncontroverted that respondent and deceased made the decision to purchase, and both explicitly directed Connecticut General's representative to put the title in "D. L. and/or Reva L. Shaffer," and that was the way they thought it was thereafter. [Although the words used are not ones of art to create a tenancy by the entirety, they fall within the rule of Hoffman v. Maplewood Baptist Church, 409 S.W.2d 247, 251 [5–8] (Mo.App.1966) that the parties need not have agreed upon any particular words to be used in the instrument, but that they agreed to accomplish a particular purpose (here joint ownership with survivorship

rights), and that the purpose was not effectuated in the instrument as drawn.] As to this land it is not conclusive that the sole name of D. L. Shaffer was placed in the body of the contract as purchaser because both signed the instrument as purchasers. Quite apparently, respondent and deceased had nothing to do with the actual drafting of the deed—that was left up to Gus Davison by them. And their actual expressed desire and intention to have joint title with survivorship rights was either not carried out by Gus or not communicated by him to whomever was the scrivener of the deed. Gus' mistake or that of the scrivener was the mistake of both respondent and deceased, because he or they were the agent or agents of both parties. Kanan v. Hogan, 307 Mo. 269, 270 S.W. 646, 647, [2, 3] (1925); Snider v. Miller, 352 S.W.2d 161, 164[4] (Mo.App.1961); and compare the facts of Hoffman, supra, loc. cit. 409 S.W.2d 251. See also 66 Am.Jur.2d, Reformation of Instruments, § 21, p. 547; and Anno. 135 A.L.R. 1452, 1456.

With respect to the purchase of the 133⅓ acres of land from the Meltons, the evidence is not so directly clear and convincing that respondent and deceased intended to have joint title with survivorship rights. All that respondent told the Meltons was that she and deceased were buying the property. But again it was left up to grantors to have the deed prepared. And although the record in the Recorder of Deeds office recites that deceased deposited the Melton deed and that it was delivered to him, it was not shown that such an entry was made only on personal delivery to a grantee. As against that record stands the testimony of respondent that the deed came through the mail and it (and the deed to the 195 acres) was placed and kept in the deposit box at the home, where they must have remained until after deceased's death at which time respondent learned that the titles were not joint when she went to buy other land.

There are many other facts bearing upon the issue of mutual mistake as to both

deeds which bear favorably upon the belief of respondent and deceased that they possessed joint title to the lands. Of great significance is the exchange of 13⅓ acres of the Melton land "in the middle of the southeast quarter of the northeast quarter" of Section 9, which was deeded only to deceased, for a definitely described tract from Rolla Henry. That latter deed granted the land to respondent and deceased as tenants by the entirety. So also did the deed to 20 acres in 1948 from the Porters, and the deed to the one-half interest in 160 acres from deceased's father in 1955, and the later division of that land in 1962 from deceased's brother and wife. The only evidence here is that the bank account of respondent and deceased was joint, and from that account was paid the initial and subsequent payments on the cost of the land. The evidence is that the mobile home, the Pontiac car, and the pickup truck were held jointly by deceased and respondent. All of this evidence strongly indicates a continuing purpose between these parties that property brought to the marriage and accumulated by them during the marriage was to be held jointly with survivorship rights between them.

▆ Of great strength in respondent's favor on the issue of mutual mistake of fact as to how the titles to the land were held are the statements of deceased made at various times during the marriage. Paul, the oldest son, related the conversation with deceased showing his belief that the lands were held jointly with survivorship rights. So also did the testimony of Trilby Mulvaney, Claude Alley and Daniel L. Shaffer, Jr. The testimony of Claude Alley and Daniel L. Shaffer show also an accurate knowledge of the effect of entirety ownership in the avoidance of probate court costs and the devolution of title in the event of the simultaneous deaths of the parties, and also in the event that one preceded the other in death. Deceased exhibited to Trilby Mulvaney gratitude to and appreciation of respondent in coming to the marriage and taking care of his children as well as for the property she brought to the marriage. Taken as a whole the evidence clearly, cogently and convincingly proved that deceased and respondent mutually and mistakenly believed that the deeds to both properties conveyed title to them in legal effect as tenants by the entirety. Kanan v. Hogan, supra; Corrigan v. Tiernay, 100 Mo. 276, 13 S.W. 401 (1890); McVey v. Phillips, 259 S.W. 1065 (Mo.1924); Williamson v. Brown, 195 Mo. 313, 93 S.W. 791 (1906); Hoffman v. Maplewood Baptist Church, supra; and Annotation, 141 A.L.R. 826 et seq.

Some mention is made as to deficiencies of respondent's brief. The brief fairly presents the basic issue, and the suggestion that it be disregarded is overruled. There is some mention in the findings of fact of the trial court as to the doctrines of resulting and constructive trusts. Under the evidence those doctrines have no application, but the facts fully support the judgment of the trial court which was upon the sole ground that respondent's name was by mutual mistake and error omitted from the deeds, and that therefore the deeds should be reformed to include her name.

The judgment is affirmed.

All concur.